UNITED STATES of America, Plaintiff,

v.

Serge KOWALCHUK, a/k/a Serhij Kowalczuk, Defendant.

Civ. A. No. 77–118.

United States District Court, E.D. Pennsylvania.

July 1, 1983.

John E. Riley, Asst. U.S. Atty., Philadelphia, Pa., Kathleen N. Coleman, Trial Atty., Dept. of Justice, Washington, D.C., Jeffrey N. Mausner, Trial Atty. Dept. of Justice, Washington, D.C., for plaintiff, U.S.

John Rogers Carroll, Philadelphia, Pa., for defendant, Serge Kowalchuk.

## OPINION AND ORDER

FULLAM, District Judge.

Invoking § 340(a) of the Immigration and Nationality Act of 1952, 66 Stat. 260, as amended, 8 U.S.C. § 1451(a), the Government in this action seeks an order revoking the citizenship of the defendant, Serhij Kowalczuk, on the ground that his naturalization was "illegally procured or ... procured by concealment of a material fact or by willful misrepresentation."

In any such case, the Government bears a heavy burden of proof. *Costello v. U.S.*, 365 U.S. 265, 269, 81 S.Ct. 534, 536, 5 L.Ed.2d 551 (1961). In order to justify revocation of citizenship, the evidence must be "clear, unequivocal, and convincing," such as not to leave "the issue in doubt". *Schneiderman v. U.S.*, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796. "Any less exacting standard would be inconsistent with the importance of the right that is at stake in a denaturalization proceeding." *Fedorenko v. U.S.*, 449 U.S. 490, 505, 101 S.Ct. 737, 746, 66 L.Ed.2d 686 (1980). As stated by the Third Circuit Court of Appeals in *U.S. v. Riela*, 337 F.2d 986, 988 (3d Cir.1964):

"This burden is substantially identical with that required in criminal cases—proof beyond a reasonable doubt [citing *Klapprott v. U.S.*, 335 U.S. 601, 612 [69 S.Ct. 384, 389, 93 L.Ed. 266] (1949) ]."

■ An essential prerequisite to a lawful grant of citizenship is that the applicant's admission to this country to establish residence was itself lawful. The defendant was admitted to this country pursuant to the Displaced Persons Act of 1948, 62 Stat. 1009 (hereinafter "DPA"), enacted by Congress in 1948 to enable European refugees uprooted by World War II to emigrate to the United States without regard to established immigration quotas. Section 10 of the DPA, 62 Stat. 1003, placed the burden of proving eligibility under the Act on the person seeking admission and provided that "any person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." Moreover, the DPA's definition of "displaced persons" eligible for immigration incorporated the definition of "refugees or displaced persons" contained in Annex I to the Constitution of the International Refugee Organization of the United Nations (IRO), which became effective on August 20, 1948, and thus excluded from eligibility all persons who had "assisted the enemy in persecuting civil populations . . ." or had "voluntarily assisted the enemy forces . . . in their operations against the United Nations." In addition, § 13 of the DPA made ineligible for visas thereunder "any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States."

The defendant, Serhij Kowalczuk, together with his younger brother Mikola Kowalczuk, spent four years (1945 through 1949) at a displaced persons camp at Lexenfeld, Austria, near Salzburg. In November 1947, the defendant obtained the necessary clearance from the IRO certifying that he was indeed a refugee "of concern" to IRO. This rendered him eligible for consideration for resettlement. In order to obtain this certification, the defendant executed a detailed personal-history form (the CM/1 form).

In due course, after sponsorship in this country had been arranged, the defendant presented his IRO documentation, together with an additional personal-history questionnaire ("fragebogen") to representatives of the Displaced Persons Commission. After the required further investigation, the defendant was duly certified in 1949 as meeting the eligibility requirements of the DPA. He then applied to the Consular Service for a visa, which was granted, and he was duly admitted to the United States for permanent residence in late 1949. Thereafter, his petition for naturalization was granted on November 30, 1960, and he was thereupon admitted to citizenship.

The essential thrust of the Government's contentions in the present case is that the defendant served as deputy commandant of a unit of the Ukrainian militia in Lubomyl, Ukraine, from 1941 to 1944; that during this period, the Lubomyl unit of the Ukrainian militia, and the defendant personally, committed acts of atrocity and repression against Jewish inhabitants of Lubomyl, and in general assisted the German cause in the war; and that, throughout the entire process leading to his naturalization, the defendant willfully concealed and intentionally failed to disclose these facts.

The Government's evidence includes the testimony of three Jewish survivors of Lubomyl, to the effect that a local Ukrainian militia, or schutzmannschaft, was established by the Germans shortly after they occupied the town in June 1941; that the defendant was a high-ranking officer of the Lubomyl schutzmannschaft; that members of this police force actively assisted the Germans in their acts of repression and atrocity against the Jewish residents of the town; and that the defendant personally committed various specified atrocities. In addition, several persons now residing in the Ukraine testified, by deposition, that they had served in the Lubomyl militia under the defendant's leadership; that they had assisted in or witnessed various acts of atrocity and repression, etc.

On the other hand, the defendant, corroborated by his brother and various other witnesses, steadfastly and vehemently denies that he ever committed or had direct

personal knowledge of any atrocities; that he occupied any position of authority in the Lubomyl police force; that he was issued a uniform or carried a weapon; and that his involvement with the Lubomyl militia (which was only on a part-time basis) actually constituted "membership" in that organization. The defendant's position is that he worked for the local government of the Town of Lubomyl in a clerical capacity. His principal job had to do with food-distribution and rationing, and was performed at a food warehouse; but he did do part-time work for the local police department, typing duty-rosters, requisitions, reports, etc. He never wore a uniform while on duty, and never did any street patrolling or other enforcement activity.

If the defendant personally committed the serious atrocities against the Jews of Lubomyl charged by the Government, cancellation of his citizenship in this proceeding would be inevitable, for a variety of reasons. A person guilty of assisting the Nazis in such persecutions would not have been "of concern" to the IRO, and thus would not have met the definition of a displaced person under the DPA. Concealment of that history would, at some stage of the. proceeding, constitute a willful misrepresentation or concealment of material facts for purposes of gaining entry to the United States, rendering such entry illegal and hence disqualifying. And, arguably at least, failure to disclose such a history in connection with the naturalization petition would amount to willful concealment of criminal activity; and such lack of candor might demonstrate lack of good moral character at the time of the naturalization petition.

If the defendant was a member of the Ukrainian militia, but did not personally participate in or have direct knowledge of acts of atrocity and repression, the question would be whether the Ukrainian militia at Lubomyl constituted an organization which did assist the Nazis in persecuting civilians, and, if so, whether mere membership in such an organization would be disqualifying. The remaining question, under that scenario, would be whether willful misrep-

resentation or concealment of a material fact has been established.

And finally, if it is determined that the defendant was not actually a member of the Lubomyl militia but merely carried out civilian duties for the town government, the question would be whether failure to disclose such employment (and his residence at Lubomyl) on the various personal-history forms (the CM/1 form and the fragebogen) is a sufficient basis for revocation of citizenship in this proceeding.

Thus, the analysis leading to a correct disposition of this litigation has two components: the defendant's actual wartime activities, and whether the defendant was guilty of willful misrepresentation of concealment of material facts. For a variety of reasons, neither line of inquiry has been easy.

Determination of exactly what did or did not occur during the relevant 1941–1944 period is rendered particularly difficult in this case, not only because the pertinent events occurred nearly 40. years ago, but because, unlike virtually every other reported denaturalization case, there is in this case not one scrap of documentary evidence relating to the pertinent events. The factfinder is relegated entirely to the testimony of witnesses, uncorroborated by any documentary evidence, and unrefreshed by any contemporaneous or relatively early recordation of their recollections of the pertinent events. For example, none of the Government's witnesses against the defendant is on record with any charges against the defendant until 1975 or 1976. None of the important witnesses for either side is fluent in the English language. Many testified through interpreters, and all would have benefitted from such assistance. And many testified by way of videotape deposition. It is extremely difficult to reach a confident conclusion, on the basis of witness demeanor, concerning the accuracy and reliability of testimony presented on videotape through an interpreter. Moreover, none of the witnesses can be deemed truly impar-

tial, for reasons which will be elaborated below.

It is obvious, of course, that if the Government's witnesses were correct, the defendant and his witnesses were lying; and if the defendant is correct, the government witnesses were either lying or simply mistaken, in identifying this defendant as a participant in atrocities. With relatively minor exceptions, there was nothing in the demeanor of any of the witnesses that would cause me to believe, with any degree of confidence, that any of the witnesses for either side was consciously lying. In the absence of persuasive clues derivable from witness demeanor, it is necessary to look to other factors which tend to corroborate or impeach the various accounts.

## FACTORS TENDING TO CAST DOUBT UPON THE DEFENDANT'S VERSION

The defendant was approximately 21 years of age when the Germans occupied Lubomyl. His father had been at odds with, and dealt with harshly by, the Russian government earlier in his life, and it would be natural to suppose that the entire Kowalczuk family, all ardent anti-Communists, would be inclined to support the German cause. The defendant was able-bodied, in good health, and of suitable age for military service. It is unlikely that he would have been permitted to escape some form of military service or forced labor, except by performing local police duties approved by the Nazis, and under their direction. Assignment to the warehouse to supervise food distribution under the rationing plan would not be inconsistent with membership in, and even a high-ranking position in, the Lubomyl schutzmannschaft. If the Lubomyl schutzmannschaft generally were as active in repressive activities as the Government's evidence suggests, it would be most unlikely that the defendant would not have known about it. Yet the defendant, by his own testimony, worked daily at the police station, typing and distributing duty rosters, typing and filing police reports, etc. It is inconceivable that these reports would not have dealt with instances of repression of the Jewish population.

By defendant's own account, he had been performing clerical duties at the police station for about a year when, in August 1942, he was sent away for additional training in local administration. The Government suggests that this testimony is a complete fabrication, designed to provide defendant with an alibi for the events leading up to and culminating in the October 1, 1942 liquidation of the Lubomyl ghetto. The evidence as a whole leads me to believe that the defendant probably was absent from Lubomyl attending training classes during the period in question. But it is significant that, as the defendant himself concedes, this additional schooling included classes in the German language, and that the additional training was arranged by the "town government" set up by the occupying Germans. It is impossible to avoid the inference that the defendant had found favor with the Nazi occupiers of Lubomyl, and was being trained for even greater service in the future.

If the defendant's activities had been as innocuous as he claims, there would have been little reason for him to leave Lubomyl with the retreating Germans. It must be admitted, however, that this argument is considerably weakened by the fact that the defendant's parents, at least, had valid reasons for leaving at that time, and it would be quite understandable that the family would wish to remain together. Moreover, flight from the advancing Russian army was a widely prevalent mode of behavior.

When the defendant filled out his CM/1 form, he omitted all mention of his residence and employment in Lubomyl. According to that form, plaintiff spent the entire 1939–1944 period working as a tailor in the town where he was born and grew up, Kremainec (stated to be in Poland, but actually in that part of the Ukraine which had been occupied and governed by Poland from 1920 until World War II).

The Soviet witnesses, and some of the non-Soviet witnesses, who testified for the Government were personally acquainted

with the Kowalczuk family, and therefore unlikely to have made an honest mistake in identification. And, it can be argued, it is unlikely that there could be so many instances of mistaken identification.

## FACTORS TENDING TO CAST DOUBT UPON THE GOVERNMENT'S EVIDENCE OF DEFENDANT'S PARTICIPATION IN ATROCITIES

Although the Nazi regime was characterized by meticulous record-keeping, not one scrap of documentary evidence has ever surfaced which reflects or even refers to the happenings at Lubomyl, the existence of a Lubomyl schutzmannschaft, the extent to which indigenous forces were used by the Germans in that area, etc. Both the Soviet Union and the western allies compiled extensive lists of persons suspected of war crimes; the defendant's name has never appeared on any such list. The Ukrainian militia was never listed as a suspect organization.

After the Russians occupied the Ukraine, they arrested and prosecuted various members of the Ukrainian militia, including persons who had been stationed at Lubomyl. It is reasonably clear that the defendant's name was never mentioned in any of those trials as a participant in atrocities.

All of the non-Soviet witnesses for the Government claim to have had many discussions among themselves, over the years, reminiscing about the events at Lubomyl, and some of them have previously aided in the prosecution of persons suspected of anti-Jewish activities, including testimony at some of the war crimes trials. Yet no complaint against the defendant was ever registered, nor, so far as the record discloses, was his name even mentioned by any of these witnesses, until 1975.

The defendant never made any attempt to conceal his identity. Neither did his brother, Mikola. Both men spent four years in the displaced persons camp at Lexenfeld, Germany. Although defendant's CM/1 form did not disclose that he had lived and worked in Lubomyl, his brother's did. The camp population included at least 800 Ukrainians, many from the same area in which Lubomyl is located. Throughout this period, there was fierce competition for the few available visas. It seems highly unlikely that, if the defendant or his brother had been guilty of disqualifying repressive activities, the defendant's guilty secret would not have been put to advantageous use by other visa-seekers.

Immediately upon his arrival in this country in 1949, defendant obtained employment as a tailor. He has held the same job ever since. His employer is Jewish, and testified, most impressively, in favor of the defendant at the trial. It is clear that neither his employer nor any of the many other witnesses who have been intimately associated with the defendant in the post-war years ever detected any trace of anti-Semitism in the defendant, or any character traits consistent with the type of person who might have been involved in atrocities.

The Government's case is significantly weakened by the undisputed evidence concerning the genesis of the present charges against the defendant, and the genesis and history of similar charges against his brother Mikola. Because of their importance, the circumstances will now be reviewed in some detail.

Throughout their stay at the DP camp, and for several years after their arrival in this country, the defendant and his brother had been unable to ascertain the fate of other members of the Kowalczuk family, or the whereabouts of any surviving relatives. It was not until 1958 that they were able to locate other members of the family, who had returned to the Ukraine and were residing there. Beginning in 1958, the defendant and his brother corresponded with their surviving relatives in the Ukraine, and periodically sent packages of food and consumer goods. That practice was frowned upon by the Soviet authorities, not only because it was viewed as an unwelcome reminder of the disparities between the living conditions in the United States and in the Soviet-controlled Ukraine, but also because most Ukrainian emigres were supporters of Ukrainian independence. It soon

became apparent that the recipients of defendant's letters and packages were likely to be harmed, rather than helped, thereby; and the Kowalczuk brothers decided to discontinue the correspondence until Soviet-American relations improved. But as a result of the correspondence, Soviet officials learned of the defendant's existence and whereabouts.

The first accusations against the defendant and his brother appeared on December 8, 1963, in a Soviet publication called "Trud". "Trud" is the (unofficial) organ of the KGB. It was then, and continues to be, the policy of the Soviet government to castigate, and undermine the acceptability of, the Ukrainian independence movement. Moreover, during much of the "Cold War" era, depicting the United States as a haven for war criminals would coincide with Soviet interests. And there is ample support in the record for the proposition that false or exaggerated accusations have often been employed by the Soviet government as a political weapon.

Shortly after the charges were published in Trud, they were picked up by the wire services and publicized in this country. Both the defendant and his brother indignantly denied the charges. At that time, Mikola's application for citizenship was pending. The charges were thoroughly discussed with Mikola Kowalczuk by INS officials. On the basis of their investigation, the INS did not recommend that the application be rejected. Instead, the court was advised of the charges and Mikola Kowalczuk's denials, and was further advised that INS had been unable to substantiate the charges. Mikola's application for citizenship was granted. Nevertheless, in 1977, contemporaneously with the filing of the present action against Serhij Kowalczuk, the Government filed a similar petition seeking to revoke the citizenship of Mikola Kowalczuk, on the ground that he had falsely concealed his membership in the Ukrainian militia, and his participation in the Lubomyl atrocities. It was not until shortly before the trial of the present case that the Government withdrew its complaint against Mikola Kowalczuk, conceding that the evidence against him was insufficient.

It is reasonably clear that, on the basis of interviews with the Israeli witnesses, the Government was prepared to proceed against both brothers. Indeed, some of the Israeli witnesses in this case identified Mikola as a member of the Ukrainian militia active in assisting the Nazi oppressors. The decision to drop the case against Mikola was made after it became apparent that the testimony of the Soviet witnesses who had actually served in the Lubomyl contingent of the Ukrainian militia would not support the charges against Mikola. It is worthy of note that, at the time of the pertinent events, Mikola Kowalczuk would have been about 15 years of age.

Thus, while it can be argued that the failure of the Soviet witnesses to implicate Mikola enhances the credibility of their testimony against the defendant, there remain serious questions about the reliability of the testimony of the Israeli witnesses. Witnesses who stand ready to identify as a leader of the Ukrainian militia someone who turns out to have been only 15 at the time, and, apparently, not involved in such activities, may very well be mistaken in their recollection of other pertinent details.

Turning now to an analysis of the testimony of the non-Soviet witnesses, several problems bear mention. As noted above, the record as a whole proves beyond doubt that the specific atrocities referred to by the various witnesses did in fact occur. But whether the account of a particular witness is based upon complete and accurate firsthand observations, or upon the common knowledge of the community, or partial observations reinforced by hearsay, cannot readily be determined. Neither is it possible to determine with certainty the extent to which the witnesses' identification of the defendant as a participant may be the product of more recent reinforcement. A witness who is aware that the commandant or deputy commandant of the Lubomyl schutzmannschaft worked hand-in-glove with the Nazis in persecuting Jews, and who learns

years later that the defendant has been charged with having served as the commandant or deputy commandant, might readily achieve a firm present recollection that indeed it was the defendant who participated in particular incidents.

There were three non-Soviet witnesses to the events at Lubomyl who testified at the trial. Moshe Lipshultz and Shimeon Koret testified by videotape deposition, Mr. Getman testified in person. I am confident that all three gentlemen testified honestly, and the comments which follow are not in any way intended as criticism; but it is important to recognize the necessity of avoiding the perhaps natural tendency to translate one's feelings of outrage at the atrocities undoubtedly committed by the Nazi occupiers of Lubomyl, and sympathy for the victim-witnesses, into uncritical acceptance of all of the details of their testimony. The plain fact is that there are substantial reasons for questioning the reliability of this evidence, insofar as it purports to involve the defendant in specific acts of atrocity.

The witnesses all identified (with some variations in definiteness) photographs of the defendant as being the person observed committing atrocities. There is no possibility of evaluating the fairness or reliability of the identification process. The record does disclose that the identification procedures were conducted by officials of the Israeli government, and that each of the witnesses knew in advance that the investigation concerned the activities of "Nazi war criminal Serhij Kowalczuk."

Mr. Getman, the only witness who testified at trial in person, was not asked to, and did not, identify the defendant in the courtroom. Moreover, Mr. Getman was only 15 years of age when the pertinent events occurred, and resided in a rural area outside of Lubomyl during most of the period.

Mr. Lipshultz provided the most extensively damaging testimony against the defendant, but there is room for the suggestion that his demonstrated willingness to ascribe to the defendant personal responsibility for virtually every one of the long list of atrocities catalogued by the witness (irrespective of whether the witness was really in a position to observe, and irrespective of whether the guilty party merely bore some general resemblance to the defendant) demonstrates a tendency toward exaggeration and embellishment. It is obvious that, because of Mr. Lipshultz's prolonged efforts on behalf of a committee to establish a memorial to the Lubomyl victims, he has had many discussions with Lubomyl survivors and has become very familiar with all of their accounts of events. While his testimony may properly be relied upon as establishing that the events occurred, his identification of the defendant as a participant is plainly much less reliable. It is noteworthy, also, that his detailed and firm descriptions of the uniforms worn by the defendant, and the uniforms and weaponry of the schutzmannschaft members generally, seem totally at odds with all of the other evidence in the case.

The testimony of Shimeon Koret, a retired official of the Israeli foreign ministry, was also very damaging to the defendant. But Mr. Koret had earlier given a sworn statement to Israeli officials which differs in important details from the testimony presented at trial. Moreover, his insistence that Mykola Kowalczuk, as well as Serhij, was an active participant in the schutzmannschaft and in the atrocities in August 1941 (when Mykola was a 15-year-old student), while it could perhaps be accurate, is enough to give one pause.

The testimony of the Soviet witnesses must be viewed with even greater skepticism. While I do not believe this testimony can be simply dismissed as fabrication instigated by a hostile government, and while there was nothing in the demeanor of the witnesses (so far as this can be assessed by videotape through an interpreter), or in the conduct of the depositions, to suggest that this evidence is unworthy of belief, the fact remains that these witnesses were all selected and made available by the Soviet government and were under its control; they could scarcely be expected to testify except in support of the charges originally

aired by the Soviet government for its own reasons.

Finally, considerations of basic fairness to the defendant militate against accepting the testimony of the government witnesses as "clear and convincing" proof of charges as serious as those leveled against this defendant. Neither the Government nor the defendant was permitted to interview other persons in Soviet-controlled territory having knowledge of the facts, or even to visit Lubomyl, where a great many persons familiar with the events still reside. The notion that only selected witnesses favorable to the government have been permitted to testify (and with the opportunity for informed and meaningful cross-examination severely restricted) is not easily squared with accepted concepts of due process of law. There is also the problem of the delay in instituting the present proceedings. While there is no applicable statute of limitations, and the present proceeding is not subject to the defense of *laches,* we must not lose sight of the fact that the defendant and his witnesses have identified on this record a substantial number of persons (including, for example, a parish priest and a dentist) who were intimately familiar with the occurrences at Lubomyl and with the defendant, whose testimony might well have been favorable to the defendant, who have died in recent years.

For the most part, therefore, the factual conclusions which follow are based upon the testimony of the defendant and his witnesses, or other evidence not inconsistent with that testimony.

## FACTUAL CONCLUSIONS CONCERNING DEFENDANT'S WARTIME ACTIVITIES

The rules by which the civilian population of Lubomyl was governed during the German occupation were established entirely by the German authorities. Neither the defendant nor any other non-German bears any responsibility for the formulation of the repressive policies directed against Jews, but the occupying authorities did rely upon "indigenous forces", *i.e.,* segments of the local population, to carry on the functions of government and to enforce observance of the restrictive edicts.

Shortly after the Germans occupied Lubomyl in 1941, a schutzmannschaft was established in Lubomyl. During the relevant period, there were four significant components of the Lubomyl population: (1) the German occupiers. These included a relatively small group of permanently assigned police, the "gendarmerie" and, intermittently, military units and representatives of the S.S. and Gestapo; (2) the local Ukrainian government establishment, including the mayor and civilian employees of the government, and the schutzmannschaft, or local police force/militia; (3) the Jewish population, restricted to the ghetto, with its own *ad hoc* government, the "judenrat"; and (4) the remaining civilian population.

All able-bodied persons were expected to work. While it is not possible to derive from the evidence in this case a complete and detailed portrayal of life in Lubomyl during the war, it appears that the ruling principle was that persons who performed labor were able to obtain the necessities of life for themselves and their families, and that the arrangements by which this was accomplished depended upon the nature of the work performed and the place of employment. The German authorities operated their own food-distribution system for their personnel, and also determined (apparently) the arrangements by which food and other supplies were allocated to the various segments of the local population. At any rate, it is clear that the local Ukrainian authorities were responsible for the distribution of food to persons employed by the local government, including the schutzmannschaft. The defendant was responsible for the distribution of food and other supplies to persons entitled to receive the same by virtue of their employment as part of the local government (and, it appears, also to some extent with the distribution of allotments of supplies to the local governments of other nearby communities).

Defendant's work at the food-distribution warehouse was not a full-time job. It de-

pended upon the amount of food and other supplies available, and generally occupied less than half of the work day.

The evidence as a whole makes it quite clear that the defendant did occupy a position of some responsibility with the schutzmannschaft. He had his own office there (one of only three such private offices); he typed up and issued duty rosters; he typed the daily reports of police activity, etc. He probably wore a police uniform of some kind, during at least some of his duty hours at the police station.

Neither the German gendarmerie nor the schutzmannschaft or other members of the local Ukrainian government was aware of the fate which was planned for the Jewish population. They knew that Jews were being rounded up, and that they were to be confined in the ghetto. They knew that Jews were to be punished if they failed to wear the appropriate insignia, if they left the ghetto, or if they otherwise violated the restrictions placed upon them. The ultimate liquidation of the Jewish population of Lubomyl in September-October 1942 was planned and carried out by a roving contingent of the einsatzgruppen. It is doubtful that even the local German gendarmerie had advance warning of the project.

█ The Germans who carried out the liquidation utilized significant numbers of Ukrainian militiamen to assist them in escorting the Jews from the ghetto to the execution site, and to prevent escapes. It is very clear that most of these Ukrainian militia were imported specifically for the task, from locations other than Lubomyl. Although the record leaves open the distinct possibility that members of the Lubomyl schutzmannschaft were also involved, I am inclined to doubt that the defendant participated in any way. It suffices to register my firm conclusion that the evidence is plainly insufficient to constitute clear and convincing proof of defendant's involvement in the massacre.

█ What the evidence does establish with the requisite clarity and conviction is that the Lubomyl schutzmannschaft regu-

larly and routinely enforced the martial law restrictions imposed by the Germans, including beating Jews found outside the ghetto after curfew, beating or severely reprimanding Jews who failed to wear the required insignia, assisting the Germans in confiscating valuables from the Jewish inhabitants, arresting and participating in the harsh punishment of persons involved in black-market activities or subversive activities hostile to the German occupation forces; and that the defendant was aware of the responsibilities assigned to the schutzmannschaft, and occupied a responsible position, albeit largely clerical, within that organization.

The record reveals few if any instances in which the Ukrainian militiamen performed serious acts of oppression outside the immediate presence of the Germans who exercised ultimate control. It is apparent, however, that members of the schutzmannschaft accompanied the German gendarmes on the many occasions disclosed by the testimony when persons were rounded up for forced labor, or arrested for various supposed infractions; that many of the persons thus apprehended were killed soon afterward; and that members of the schutzmannschaft were present during such executions. Although the evidence does not disclose, with the requisite clarity and conviction, that the defendant personally participated in any of these individual atrocities, the evidence as a whole leaves little doubt that everyone associated with the schutzmannschaft, including the defendant, must have known of the harsh repressive measures which the schutzmannschaft were carrying out pursuant to German direction.

FACTUAL CONCLUSIONS CONCERNING MISREPRESENTATION AND CONCEALMENT IN THE PROCESSES LEADING TO NATURALIZATION

In his CM/1 personal-history form, the defendant intentionally misrepresented and/or concealed his residence in Lubomyl and his employment by the town government there during the German occupation.

When this form was filled out, it is probable that defendant's principal motivation was to avoid the risk of repatriation to Soviet-controlled territory; and it is entirely possible that he informed the interviewer of the true situation, as he testified. It is unnecessary to resolve this issue, however, since the statements in the CM/1 form were not made to an official administering the DPA, nor were they made for the purpose of gaining admission to the United States.

In applying for a visa and submitting the fragebogen, however, the defendant plainly was making representations for the purpose of gaining entry to the United States. It is probably true that the background information in the fragebogen was largely the result of merely copying the information set forth in the CM/1 form, but the defendant cannot avoid responsibility for the inaccuracies and omissions in that submission.

It is not at all clear that, in 1949, membership in or employment by the schutzmannschaft at Lubomyl would have precluded the issuance of a visa. Until the 1950 amendment to the DPA, IRO certification of eligibility was being accepted as virtually conclusive. It is significant that the Government is able to cite several instances of rejection of applicants for their association with the Ukrainian militia, but all of these instances occurred after the 1950 amendment of the statute. On the other hand, the testimony of Mr. Thomas makes it clear that, even in 1949, disclosure of membership in the Ukrainian militia would at least have prompted further inquiry. And it seems quite probable that consular officials would not knowingly have issued a visa to a person who actively assisted the Nazis in persecuting civilians, regardless of the extent of his direct personal involvement in atrocities.

## LEGAL ISSUES

The statute requires revocation of citizenship if it was either illegally procured, or procured by willful concealment or misrepresentation of material facts. 8 U.S.C. § 1451(a). In *Chaunt v. U.S.*, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960),this con-

text, "material facts" are those facts which, if disclosed, "(1) . . . would have warranted denial of citizenship or (2) . . . might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship." 364 U.S., at p. 355, 81 S.Ct. at p. 150.

In my view, the record does not justify a conclusion that, in his application for citizenship, the defendant knowingly provided false information. And, unless he had personally committed serious atrocities (a fact not proven, as discussed above), it is doubtful that his failures to disclose amounted, at that point, to "willful concealment".

In *Fedorenko v. U.S., supra,* the Supreme Court left open the question of the applicability of the *Chaunt* tests to antecedent visa applications. The Court found it unnecessary to address that issue because of its conclusion that Fedorenko's visa had been illegally procured, thus rendering his entry to the United States illegal, and the grant of citizenship similarly flawed as a result. While *Fedorenko* was a much clearer case than is Kowalczuk's (service as a concentration camp guard is more obviously persecution than is service on a local police force), that decision controls disposition of the present case. The same ultimate conclusion inevitably follows.

## ULTIMATE CONCLUSIONS

■ 1. The defendant Serhij Kowalczuk was not a genuine refugee "of concern" to the IRO, and therefore was not entitled to the benefits of the Displaced Persons Act, because:

a. He assisted the Nazis in persecuting civilian populations, through his role as a member of the Lubomyl schutzmannschaft.

b. The Lubomyl schutzmannschaft, of which the defendant was voluntarily a member, voluntarily assisted the enemy forces in their operations against the United Nations.

2. Defendant Serhij Kowalczuk illegally obtained his visa, because he made a willful misrepresentation for the purpose of gaining admission into the United States as an

eligible displaced person, within the meaning of § 10 of the DPA.

3. Because his entry into the United States for permanent residence was illegal, the defendant Serhij Kowalczuk illegally obtained his naturalization certificate.

4. The petition of the Government must be granted.

### ORDER

AND NOW, this 1st day of July, 1983, it is ORDERED:

1. The Government's Amended Petition for revocation of citizenship of the defendant Serhij Kowalczuk is GRANTED.

2. The Order of this Court, entered November 30, 1960, admitting Serhij (Serge) Kowalczuk, to United States citizenship, is REVOKED AND SET ASIDE.

3. Certificate of Naturalization No. 8250996 issued to the defendant is CANCELLED.

4. The defendant is ordered forthwith to surrender said Certificate of Naturalization to the United States Attorney of this District.