MATTER OF McMULLEN

In Deportation Proceedings

A-23054818

*Decided by Board May 25, 1984*

(1) An alien seeking asylum or withholding of deportation under sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1982), has the burden of showing that the persecution he fears is based on his race, religion, nationality, membership in a particular social group, or political opinion.

(2) The respondent's refusal, for reasons of personal safety, to carry out a kidnapping assignment ordered by the Provisional Irish Republican Army ("PIRA") neither constitutes political opinion nor represents conduct which Congress intended to protect by its adoption of the asylum and withholding provisions contained in the Act.

(3) Any person who ordered, incited, assisted, or otherwise participated in the persecution of others on account of race, religion, nationality, membership in a particular social group, or political opinion is specifically excluded from the definition of "refugee" under section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (1982), and is thus ineligible for asylum under section 208(a) of the Act; similarly, such a person is prohibited from obtaining withholding of deportation under section 243(h)(2)(A) of the Act.

(4) The statutory exclusion from the definition of "refugee" of those persons who have participated in the persecution of others represents the view of the Congress that such persons are unworthy and undeserving of international protection.

(5) The scope of the statutory exclusion of those persons who have participated in the persecution of others is not limited to acts committed in an official capacity but is equally applicable to acts committed within the framework of various non-governmental groupings, whether officially recognized, clandestine, or self-styled, and this restriction applies even though the person so excluded may, in fact, be the subject of persecution and notwithstanding that his persecution of others was politically motivated.

(6) The respondent, by his active and effective membership in the PIRA, participated in the persecution of targeted individuals based upon their public opposition to the PIRA and its terrorist activities and, as such, he may not be considered a refugee within the meaning of the Act and is, accordingly, statutorily ineligible for both asylum and withholding of deportation.

(7) The respondent's involvement in the terrorist use of explosives and his participation in the PIRA's campaign of violence randomly directed against civilians represent acts of an atrocious nature out of proportion to the political goal of achieving a unified Ireland and are not, therefore, within the political offense exception; ac-

cordingly, his conduct provides "serious reasons for considering" that he has "committed serious non-political crimes" prior to his arrival in this country, making him statutorily ineligible for relief under sections 208(a) and 243(h) of the Act.

CHARGE:

Order: Act of 1952—Sec. 241(a)(1) [8 U.S.C. § 1251(a)(1)]—Excludable at entry under section 212(a)(19) [8 U.S.C. § 1182(a)(19)]—Procured visa by fraud or willful misrepresentation of a material fact

Sec. 241(a)(1) [8 U.S.C. § 1251(a)(1)]—Excludable at entry under section 212(a)(26) [8 U.S.C. § 1182(a)(26)]—No valid nonimmigrant visa

ON BEHALF OF RESPONDENT:
Terry J. Helbush, Esquire
Simmons & Ungar
517 Washington Street
San Francisco, California 94111

ON BEHALF OF SERVICE:
Gerald S. Hurwitz
Appellate Trial Attorney

BY: Milhollan, Chairman; Maniatis, Dunne, and Vacca, Board Members. Board Member James P. Morris has abstained from consideration of this case.

On October 1, 1980, this Board sustained the Immigration and Naturalization Service's appeal from a decision of an immigration judge finding the respondent deportable but granting his applications for asylum and withholding of deportation pursuant to sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1982). *Matter of McMullen,* 17 I&N Dec. 542 (BIA 1980). On October 13, 1981, the United States Court of Appeals for the Ninth Circuit granted the respondent's petition for review and reversed this Board's finding that the respondent had not established the likelihood of persecution at the hands of the Provisional Irish Republican Army ("PIRA") and that the government in Ireland was unable or unwilling to protect him. *McMullen v. INS,* 658 F.2d 1312 (9th Cir. 1981). In its order, the Ninth Circuit did not grant the respondent asylum or withholding of deportation; nor did it resolve all of the issues presented. Although the court did not specifically remand the case for further consideration, the parties agree that the case is properly before the Board. We will, therefore, reconsider our decision of October 1, 1980, under the provisions of 8 C.F.R. § 3.2 (1984). Upon reconsideration, the Service's appeal is again sustained.

The respondent is a 36-year-old native and citizen of the Republic of Ireland and the United Kingdom.[1] He last entered the United

---

[1] The respondent claims Irish citizenship through his grandmother's birth in Northern Ireland prior to 1921.

States on April 29, 1978, as a nonimmigrant visitor, using a fraudulent passport bearing the name of Kevin O'Shaughnessy. On May 19, 1978, the respondent was charged with deportability under section 241(a)(1) of the Act, 8 U.S.C. § 1251(a)(1) (1976), as an alien excludable at entry under section 212(a)(19), 8 U.S.C. § 1182(a)(19) (1976), for having procured a visa by fraud, and as an alien excludable at entry under section 212(a)(26), as a nonimmigrant not in possession of a valid nonimmigrant visa. At his deportation hearing the respondent admitted the allegations contained in the Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien (Form I-221S) and conceded his deportability as charged. His deportability is not at issue.

The facts of this case have previously been discussed in both the Ninth Circuit's decision and our prior order. The respondent claims that he would be subject to persecution by the PIRA if deported to the Republic of Ireland. The record overwhelmingly establishes that the PIRA is a clandestine, terrorist organization committed to the use of violence to achieve its objectives. During the course of these proceedings the respondent has submitted 37 exhibits, containing more than 300 pages, consisting of newspaper and magazine articles, scholarly reports, and other publications, documenting PIRA terrorist activities between 1968 and 1979.[2] The statement of Dr. Jeffrey Prager, submitted on appeal as Exhibit A to the respondent's May 5, 1982, supplemental brief, indicates that the PIRA, formally established in 1969, grew out of the increased political agitation in Northern Ireland in the late 1960's. He states that it represented a break with the controlling faction of the Irish Republican Army ("IRA") committed to the use of parliamentary, nonviolent means of achieving a unified Ireland. The PIRA's commitment to physical force is characterized by attacks on both government civilian institutions and military installations, random violence against innocent civilian populations through indiscriminate bombing campaigns, the murder or maiming of targeted individuals for political reasons based on their public opposition to the PIRA, and the use of violence to maintain order and discipline within the PIRA's membership. Its operations have been funded, in part, through the commission of thousands of armed robberies.

The exhibits reflect that these terrorist attacks, which include murder, torture, maiming, and indiscriminate bombings, have been

---

[2] Respondent's exhibits 1-27 were made a part of the record as Group Exhibit 3, his exhibits 28-33 were made a part of the record as Group Exhibit 4, and his exhibits 34-35 were made part of the record as Group Exhibit 7. The respondent's supplemental brief on appeal contained two additional exhibits (A and B).

directed against the civilian and military populations and social institutions of Northern Ireland, the Republic of Ireland, and Great Britain. Between 1968 and 1978, random bombings numbering in excess of 4,000 have resulted in payment of compensation claims, primarily related to property damage, of more than $280 million. An example of the PIRA's suppression of public opposition reflected in the respondent's exhibits was the December 1975 doorstep murder of Ross McWhirter, 50-year-old founder and co-editor of the Guiness Book of Records. In response to increased terror bombings in London by the PIRA, McWhirter had been campaigning for IRA terrorists to be charged with treason, the only crime that still carried the death penalty in Great Britain, and had organized a fund to put up rewards totaling $102,000 for the capture of terrorists. The PIRA later claimed credit for McWhirter's assassination. The PIRA is also believed to be responsible for the murder of Lord Mountbatten, his 14-year-old grandson, and others in his boating party in September 1979, and for the murder of Sir Richard Sykes, the ambassador to the Netherlands who was shot to death in The Hague in March 1979.

The respondent testified that the PIRA's use of violence and bombing campaigns rapidly escalated following the Government's institution of its internment (detention without trial) policy in August 1971. He also claimed responsibility for the bombing of the British Army's Palace Barracks outside of Belfast, Northern Ireland, in January 1972. The respondent testified that the PIRA engages in beatings, kneecappings (crippling by shooting into or crushing the victim's knees), and murder to maintain discipline within its membership. He contended that the PIRA commits its violent crimes in the context that it is acting as a government, that it recognizes no other courts or government, and that it is the only source of law and order in the country.

In January 1972, the respondent deserted his British Army unit and joined the PIRA. The respondent's duties with the PIRA included providing military training to its members and conducting special operations which involved intelligence collection and execution of operations. In 1972 he was sent to the United States by the PIRA's General Headquarters in Dublin to coordinate arms purchases and shipments. He stated that he was responsible for coordinating a considerable number of arms shipments back to Northern Ireland. The respondent testified that he had no fear of reprisals in 1974 after his initial resignation from the PIRA, as he had been on excellent terms with the organization between 1972 and 1974, and that until his refusal in 1977 to participate in a PIRA operation to kidnap an American citizen for ransom, he was highly respected as

an effective member. The record reflects that the respondent refused to carry out the kidnapping for reasons of personal security based on his belief that the operation would not be successful.

On review, the Ninth Circuit found that the respondent's evidence established that the PIRA is a clandestine, terrorist organization, that the Government of the Republic of Ireland is unable to control the PIRA, and that the respondent was likely to suffer persecution by the PIRA if returned to the Republic of Ireland. The Ninth Circuit did not reach the question of whether the persecution the respondent was likely to suffer would be the result of his political opinions within the meaning of the Act. In reaching this question now, we note at the outset that the burden is on the respondent to show that the persecution he fears by the PIRA is based on his race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.5 (1984); *Matter of McMullen, supra.* We conclude that the respondent has failed to establish that the persecution he fears is based on his political opinion or any of the other enumerated grounds within the Act for which asylum and withholding of deportation may be granted.

The respondent argues that his resignation from the PIRA in 1974 and his subsequent refusal in 1977 to participate in the kidnapping of a United States citizen for ransom represents political opinion for which the PIRA now seeks his persecution. He argues that his refusal to carry out the kidnapping assignment and the subsequent PIRA Court of Inquiry in 1978 charging him with the "military violation" of failing to carry out an order was the culmination of 4 years of conflict and differences between the respondent and the PIRA. The record does not support this argument. By his own admissions he was on excellent terms with the PIRA in 1974 and did not fear any reprisals by the organization as a result of his resignation at that time. Nor does the record contain any evidence of ill will by the PIRA towards the respondent because of the resignation. Following his release from prison in 1977 the PIRA approached the respondent and requested his assistance. Despite his claim that he agreed to work for the PIRA because of threats, he subsequently testified that the reason he began working with the PIRA in 1977 was because "[t]hey were low on manpower and money and the organization was trying to get back on its feet." The only evidence in the record suggesting a basis for the PIRA's persecution of the respondent is his refusal to carry out the kidnapping assignment. With regard to this refusal, the respondent testified that his reasons were primarily for his personal security based on his belief that too many people knew about the operation and that as a result it more than likely would have failed.

94

We are satisfied from a review of the record that the respondent has not established that the persecution he fears by the PIRA is based on political opinion or any other designated ground within the Act. His refusal to commit the crime of kidnapping for reasons of personal safety does not constitute political opinion. Nor does it represent conduct which Congress intended to protect by its adoption of the asylum and withholding provisions contained in sections 208(a) and 243(h) of the Act. The record clearly shows that the PIRA uses violence and threats of violence internally to maintain discipline and order within the rank and file of its membership. As such, the PIRA's use of violence against its members is essentially apolitical, representing an indifference to the personal views and opinions of those members who are subject to sanctions. We conclude that this internal use of violence by the PIRA does not constitute persecution within the meaning of the Act. *See Matter of Pierre*, 15 I&N Dec. 461 (BIA 1975). Moreover, its use of internal violence existed at the time the respondent joined the PIRA and continued throughout his active membership. Having elected to participate in the PIRA, with knowledge of its internal disciplinary policies, the respondent is not now in a position to complain.

We further conclude that the respondent, by his membership in the PIRA, participated in the persecution of others and may not, therefore, be considered a refugee. He is, accordingly, statutorily ineligible for both asylum and withholding of deportation. Section 208(a) of the Act authorizes the Attorney General, in his discretion, to grant asylum to an alien who is determined to be a refugee within the meaning of section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (1982). That section defines "refugee," in relevant part, as

any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

Section 101(a)(42)(B) specifically excludes from the definition of "refugee" "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." The identical limitation regarding the scope of coverage also prohibits granting withholding of deportation pursuant to section 243(h)(2)(A). *See* 8 C.F.R. § 208.8(f)(1)(iii) (1984).

While there is no universally accepted definition of "persecution," "a threat to life or freedom on account of race, religion, na-

tionality, political opinion or membership of a particular social group is always persecution." *Matter of Laipenieks,* 18 I&N Dec. 433, 457 (BIA 1983). We recognize that the persecution contemplated under the Act is not limited to the conduct of organized governments but may, under certain circumstances, be committed by individuals or nongovernmental organizations. *Rosa v. INS,* 440 F.2d 100 (1st Cir. 1971); *Matter of McMullen, supra; Matter of Pierre, supra; Matter of Tan,* 12 I&N Dec. 564 (BIA 1967).

The record demonstrates that the PIRA engages in the persecution of targeted individuals based on their public opposition to the organization and its terrorist activities. These political assassinations are exemplified by the murder of Ross McWhirter and the suspected responsibility for the murder of Sir Richard Sykes and Lord Mountbatten. This persecution by the PIRA is distinguished from its use of violence to maintain discipline and order within the rank and file of its membership and its indiscriminate bombing campaigns, neither of which involve persecution based on political opinion.

We find that the respondent, by his active and effective membership in the PIRA, participated in the persecution of others. Our finding is supported by the London Agreement of 8 August 1945 and Charter of the International Military Tribunal[3] which includes in the definition of "crimes against humanity" "persecutions on political, racial or religious grounds" and states with regard to any such crimes that "[l]eaders, organisers, instigators and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such plan." The record reflects that at the time the respondent joined the PIRA its use of violence was escalating. The respondent testified that he was respected as an effective member of the PIRA until 1977 and that his duties included training other PIRA members and conducting special operations. We find it significant that the respondent was personally responsible for coordinating a considerable number of illegal arms shipments from the United States to Northern Ireland. Through those arms shipments the respondent directly provided, in part, the instrumentalities with which the PIRA perpetrated its acts of persecution and violence. We have no difficulty in concluding that these arms were directly involved in

---

[3] Article 6 of the London Agreement is reproduced in Annex V, of the Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* 88 (Geneva, 1979).

the murder, torture, and maiming of innocent civilians who public-ly opposed the PIRA, and we are unwilling to isolate these arm shipments from their ultimate use by the PIRA in conducting its campaign of terror. Thus, we find clear evidence that the respond-ent aided and assisted in the persecution of others within the meaning of the Act. See Fedorenko v. United States, 449 U.S. 490 (1981); Matter of Laipenieks, supra; see also United States v. Kowal-chuk, 571 F. Supp. 72 (E.D. Pa. 1983); United States v. Osidach, 513 F. Supp. 51 (E.D. Pa. 1981).

The provisions of sections 101(a)(42)(B) and 243(h)(2)(A), by ex-cluding from the definition of "refugee" persons who have partici-pated in the persecution of others, parallel and are consistent with the fundamental principles embodied in the United Nations 1951 Convention [4] and 1967 Protocol Relating to the Status of Refugees.[5] This exclusion from refugee status under the Act represents the view that those who have participated in the persecution of others are unworthy and not deserving of international protection. The persecution which forms the basis of the exclusion is not limited to acts committed in an official capacity but is equally applicable to persons who have committed such persecution within the frame-work of various nongovernmental groupings, whether officially rec-ognized, clandestine, or self-styled. This restriction on the scope of refugee status applies even though the person so excluded may, in fact, be the subject of persecution and notwithstanding that his persecution of others was politically motivated.[6] The prohibited conduct is deemed so repugnant to civilized society and the commu-nity of nations that its justification will not be heard.

We are also satisfied from a review of the record that "there are serious reasons for considering" that the respondent by his activi-ties as a member of the PIRA has committed "serious non-political crimes," making him statutorily ineligible for asylum and with-holding of deportation. 8 C.F.R. § 208.8(f)(1)(v) (1984); section 243(h)(2)(C) of the Act; see also Matter of Rodriguez-Palma, 17 I&N Dec. 465 (BIA 1980); cf. Matter of Frentescu, 18 I&N Dec. 244 (BIA 1982). Whether crimes are of a political character is primarily a question of fact. Ornelas v. Ruiz, 161 U.S. 502 (1896). In evaluating the political nature of a crime, we consider it important that the

---

[4] United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150.

[5] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967. [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[6] Compare section 243(h)(2)(C) of the Act with 8 C.F.R. § 208.8(f)(1)(v) (1984) (involv-ing ineligibility for asylum and withholding of deportation based on the commission of a "serious non-political crime").

political aspect of the offense outweigh its common-law character. This would not be the case if the crime is grossly out of proportion to the political objective or if it involves acts of an atrocious nature.

The record before us reflects that during the period of the respondent's active membership in the PIRA, that organization's use of random bombings of civilian targets increased. An example of this random bombing, depicted in the respondent's exhibits, was the detonation of 500 pounds of explosives contained in a van parked on a Belfast street, half a block from the Europa, the city's principal hotel. The exhibits further reflect the common practice of using vehicles parked in residential streets containing 100–300 pounds of explosives. These bombings are not generally directed at specific targets but rather are designed to randomly terrorize the public. We note that such terrorist bombings have been universally condemned as atrocious in nature. The record further reflects that the respondent's duties as a member of the PIRA included the training of other PIRA members and the conduct of special operations. One such operation was the coordination of a considerable number of arms shipments to Northern Ireland for use by the PIRA. The actions and policies of the PIRA of which the respondent was fully cognizant and participated in while a member provided serious reasons to believe that he is responsible for committing "serious non-political crimes."

We find that the respondent's involvement in the terrorist use of explosives and his participation in the PIRA's campaign of violence randomly directed against civilians represent acts of an atrocious nature out of proportion to the political goal of achieving a unified Ireland and are not, therefore, within the political offense exception. See Ornelas v. Ruiz, supra; Eain v. Wilkes, 641 F.2d 504, 519–24 (7th Cir.), cert. denied, 454 U.S. 894 (1981). Ornelas involved extradition proceedings related to a raid on a Mexican village and its military garrison by more than 100 men, resulting in murder, arson, robbery, assault, and kidnapping of both Mexican soldiers and private citizens. The Court refused to apply the political offense exception there "in view of the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed," notwithstanding the political intentions and objectives of those who committed the violent crimes. Ornelas v. Ruiz, supra, at 510–12. It is apparent that the Court viewed the civilian status of the victims as significant in evaluating the applicability of the political offense exception and considered the raid a form of political activity not encompassed within the exception.

In *Eain*, also involving extradition proceedings, the Seventh Circuit refused to apply the political offense exception to the bombing of a West Bank marketplace, crowded with civilians, by a Palestinian Liberation Organization terrorist. The court distinguished between acts directed at civilians, "terrorist activity," and those directed at a government, with only the latter type possibly being within the political offense exception. Characterizing this distinction as the difference between "isolated acts of social violence" such as the killing of civilians, and a more concerted effort to topple the existing government in a country, the court stated:

> The definition of "political disturbance," with its focus on organized forms of aggression such as war, rebellion and revolution, is aimed at acts that disrupt the political structure of a State, and not the social structure that established the government. The exception does not make a random bombing intended to result in the cold-blooded murder of civilians incidental to a purpose of toppling a government, absent a direct link between the perpetrator, a political organization's political goals, and the specific act. Rather, the indiscriminate bombing of a civilian populace is not recognized as a protected political act even when the larger "political" objective of the person who sets off the bomb may be to eliminate the civilian population of a country.

*Eain v. Wilkes, supra*, at 520–21. Comparing terrorist activities directed at the civilian population with those of the anarchist, the court concluded:

> As recent commentators have stated, "an offense having its impact upon the citizenry, but not directly upon the government, does not fall within the political offense exception." *See* Costello, *International Terrorism and the Development of the Principle Aut Dedere Aut Judicare*, 10 J. Int'l Law & Econ. 475, 501 (1975) quoting U.N. Secretariat study: "[T]he legitimacy of a cause does not in itself legitimize the use of certain forms of violence especially against the innocent[.]" (Citation omitted.)

*Id.* at 521. In view of the respondent's effective participation in the PIRA and the nature of the offenses perpetrated against innocent civilians, we conclude that he has committed "serious non-political crimes" and is ineligible for the requested relief.

Moreover, considering the record in its entirety, we find that the respondent is not deserving of asylum and specifically deny this relief in the exercise of discretion. *Matter of Salim*, 18 I&N Dec. 311 (BIA 1982). In *Salim*, asylum was denied in the exercise of discretion based on the alien's avoidance of this country's orderly refugee procedures through the use of fraudulently obtained documentation. Although present in the instant case, the respondent's use of fraudulently obtained documentation is clearly overshadowed by the serious adverse factor of his involvement in the PIRA's random violence directed against innocent civilians. He may not separate the active and effective role he played in the PIRA's operations from responsibility for that organization's indiscriminate bombing

campaigns or its murder, torture, and maiming of innocent civilians who disagreed with the PIRA's objectives or methods. The record contains no countervailing equities to overcome the extremely negative discretionary factors present.

Accordingly, we will again sustain the appeal.

**ORDER:** On reconsideration, the appeal is sustained, and the respondent shall be deported to the Republic of Ireland.