In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1888

Ahmad Mousa,

Petitioner-Appellant,

v.

Immigration and Naturalization Service,

Respondent-Appellee.

Appeal from the Board of Immigration Appeals
No. A71 804 422

Argued December 2, 1999--Decided August 1, 2000

Before Ripple, Kanne, and Diane P. Wood, Circuit
Judges.

Diane P. Wood, Circuit Judge.  Ahmad Mousa, a
citizen of Jordan illegally residing in the
United States, was convicted of mail fraud in
1991. The Immigration and Naturalization Service
(INS) moved quickly to deport him. Mousa applied
for asylum based on a fear of political
persecution in his home country, but the INS
denied the application, and the Board of
Immigration Appeals (BIA) rubber-stamped the
denial. While we have no praise for the
perfunctory manner in which this case was
handled, we find no abuse of discretion, and
therefore affirm.

Mousa was admitted to the United States for a
maximum six-month stay as a non-immigrant visitor
in December of 1987. Mousa claims that the
problems that led to his appearance in this
country began in 1967, when the West Bank, the
part of Jordan in which he lived, was annexed by
Israel. It was then that Mousa joined Fatah, a
wing of the Palestinian Liberation Organization
(PLO) devoted to forcing Israel to leave the West
Bank by means of armed struggle. Though the Arab-
Israeli war was officially over on May 23, 1968,
Mousa led a group of five Fatah members in an
attempted attack of a non-combatant Israeli
military camp situated in the West Bank. The

group approached the camp at 4:00 a.m., armed with Katusha rockets, semi-automatic rifles, and bombs. They planned to destroy the base, which housed supplies of ammunition. It also housed sleeping Israeli soldiers. Their efforts were foiled by an alert Israeli helicopter crew, who spotted the group and short circuited the Fatah mission. Everyone present emerged unscathed except for one wounded Fatah member. The five captured Fatah members were tried by an Israeli military tribunal, which convicted Mousa of being a member of Fatah, bearing arms, and commanding the mission. He was sentenced to 25 years of imprisonment, 14 of which he served before being released due to medical problems.

Mousa had been born in 1946 in an area that was then part of the Palestinian British Mandate, and which became part of the new state of Israel in 1948. Like many others, his family fled to the west bank of the Jordan River, which (as noted above) Jordan later annexed. There he grew up and lived, first in Palestinian refugee camps and later in a home. Mousa therefore considers himself a Palestinian, not a Jordanian. Nevertheless, after his 1982 release from prison, Mousa was returned to Jordan. His welcome there was evidently not a warm one. Mousa's testimony, which the Immigration Judge (IJ) found credible, was that the Jordanian police harassed him throughout the next five years. At the Israeli-Jordanian border, he was attacked and interrogated by Jordanian police, who (perhaps ironically) insisted that he was an Israeli spy. They were suspicious of his Fatah membership and lengthy incarceration in Israel. Upon being admitted to Jordan, Mousa was required to report to the police twice a day for six months. After that, the police continued to subject Mousa to regular questioning and surveillance. He had a very difficult time finding a job--a situation that he attributed to the police department's failure to give him a certificate of good behavior, as well as potential employers' biases against him due to his Fatah and Israeli connections.

These continuing difficulties prompted Mousa to try to leave Jordan. It took a year, but he was finally able to procure a passport. In December of 1987, after the police submitted him to one last interrogation and admonished him to stay out of Jordan, Mousa came to the United States. He entered under a six month visitor visa, but he remained in the United States after it expired.

Mousa's illegal status remained undetected until 1991, when he decided to steal mail. On August 26, 1991, he was convicted of mail fraud (18 U.S.C. sec. 1709), and was sentenced to four

months' imprisonment and five years of probation. The next month the INS ordered Mousa to show cause why he should not be deported. Mousa conceded deportability, but on March 3, 1992, he filed an application for asylum and withholding of deportation under Sections 208 and 243(h) of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA), or, alternatively, for voluntary departure. At a January 14, 1993 hearing Mousa argued that as a Palestinian he was "stateless." He testified that he feared persecution by the Jordanian police should he be forced to return there. The IJ denied Mousa's asylum application on February 1, 1993, and the BIA summarily affirmed that judgment on March 17, 1999.

When the BIA summarily adopts an IJ's decision, we review the IJ's analysis as if it were the Board's. Lwin v. INS, 144 F.3d 505, 508-09 (7th Cir. 1998). The decision must be upheld if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. sec. 1105a(a)(4); see INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). We may reverse the decision only if a reasonable fact finder would be compelled to find that Mousa merited asylum. See Elias-Zacarias, 502 U.S. at 481.

To be eligible for asylum, an applicant must show that she is a "refugee" for purposes of the IIRIRA, and that she merits asylum as a matter of judicial discretion. 8 U.S.C. sec. 1158(a); see Sanon v. INS, 52 F.3d 648, 650 (7th Cir. 1995). However, persons who have "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion" do not qualify to be considered for asylum. 8 U.S.C. sec. 1101(a)(42)(B). Immigration Judge Petrone found that Mousa was statutorily ineligible for refugee status, because in his view Mousa's 1967 attack of the Israeli base amounted to persecution of Israelis and those opposed to the Palestine liberation movement, and thus fit the ban of sec. 1101(a)(42)(B).

Mousa argues strenuously on appeal that this conclusion was wrong as a matter of law. The few cases construing the "persecution of others" provision, he claims, stand for the proposition that military actions should not be characterized as persecution. He points to the BIA's interpretation of sec. 1101(a)(42)(B) in Matter of Rodriguez-Majano,19 I&N Dec. 811 (BIA 1988), a case involving the asylum claim of a man who had participated in guerilla warfare against the government of El Salvador, in which the BIA

wrote:

   The argument was made by respondent's counsel
that activities directly related to a civil war
are not persecution. We agree. By this statement
we mean that harm which may result incidentally
from behavior directed at another goal, the
overthrow of a government or, alternatively, the
defense of that government against an opponent,
is not persecution. . . . [E]ngaging in military
actions, the attacking of garrisons, the burning
of cars, and the destruction of other property
[are] actions outside the limits of the term
"persecution."

*   *   *

Were we to hold that practices such as attacking
military bases, destroying property, or forcible
recruiting constitute persecution, members of
armed opposition groups throughout the world
would be barred from seeking haven in this
country . . . . We do not believe that Congress
intended to restrict asylum and withholding to
only those who had taken no part in armed
conflict.

Id. at 815-16.

   Mousa also relies on the BIA's decision in
Matter of McMullen, 19 I&N Dec. 90 (BIA 1984),
which involved the claim for asylum of Peter
Gabriel John McMullen, a member of the
Provisional Irish Republican Army (PIRA). In a
sense, this reliance is curious, because the BIA
ultimately concluded that McMullen was not
entitled to asylum because, through his
participation in the PIRA, he had engaged in the
persecution of others and could not therefore be
considered a refugee. See id. at 95. Mousa notes
that the BIA at one point in the opinion focused
on the fact that the arms shipments that McMullen
coordinated led to the "murder, torture, and
maiming of innocent civilians," id. at 97
(emphasis added), and that elsewhere it also
highlighted for special criticism the "random
bombings of civilian targets." Id. at 98
(emphasis added).

    The unfortunate problem we face here is the
BIA's utter lack of effort to distinguish or to
build upon precedents like Rodriguez-Majano and
McMullen. One can certainly imagine drawing a
line between those who have attacked military
targets and those who have harmed innocent
civilians. It is also possible to construe the
term "persecution" to exclude military
operations, whether or not United States foreign
policy supports the goals of the faction in
question. Mousa makes a reasonable argument that

the BIA has in fact taken this approach, but it is difficult for us to know definitively, especially since it offered no analysis or explanation of its conclusions in the order now before us. The IJ distinguished Rodriguez-Majano as a case in which the applicant for asylum was a "mere member" of the guerilla organization, not an active participant. This is hard to swallow, given the fact that the BIA's opinion reports that he "drove supplies to San Miguel for a battle with the government forces which lasted a day and a half. He also transported the guerrillas out of the city. . . . He accompanied guerrillas on propaganda trips and once covered them with his weapon while they burned cars." Rodriguez-Majano, 19 I&N at 813. The IJ did not cite McMullen, and thus had no occasion to consider the implicit line it drew between military targets and civilian targets.

Ordinarily, this lack of an explanation would require us to remand the case to the BIA so that it could fill in the blanks. In this case, however, the record offers an alternative ground for upholding the ultimate decision to deny Mousa's application. We therefore do not need to wrestle to the ground these sensitive issues, which we reserve for another day and a proper record.

To show that he is a refugee as defined by the IIRIRA and qualified for asylum, Mousa had to prove that he is "unable or unwilling to return" to Jordan "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. sec. 101(a)(42)(A). He need not demonstrate a certainty of persecution upon his return to Jordan; the statute requires only a showing of a subjective fear of persecution and the objective reasonableness of that fear. See Sivaainkaran v. INS, 972 F.2d 161, 163 (7th Cir. 1992).

The IJ and BIA decided that Mousa did not have a well-founded fear of persecution. That finding is also difficult for us to review, both because the BIA issued only a one paragraph summary affirmance, and because the IJ's analysis of the issue (despite its obvious importance) is confined to a rather conclusory and brief paragraph. The agency was required to consider Mousa's claims and to give careful, individualized, rational explanations for its decision. See Kaczmarczyk v. INS, 933 F.2d 588, 594-95 (7th Cir. 1991); Vergara-Molina v. INS, 956 F.2d 682, 685 (7th Cir. 1992); Guentchev v. INS, 77 F.3d 1036, 1038 (7th Cir. 1996). Here, the IJ listed the applicable facts, and found that Mousa did not suffer persecution because (1)

he was not arrested or imprisoned by the Jordanian police; (2) he lived "relatively undisturbed" from 1982 to 1987; (3) he was able to obtain a passport; and (4) his biggest complaint was his inability to get a job in Jordan, an economic harm which does not constitute persecution. Although cursory, this is enough (barely) to permit our review. Once again, we are disappointed by the BIA's failure to police the quality of the reasoning offered by its immigration judges. While the BIA may fulfill its duty by merely adopting the IJ's opinion and reasoning, Guentchev, 77 F.3d at 1038, there must be some reasoning for it to adopt. That means, among other things, that the BIA must ensure that the IJ gave the record a careful, comprehensive review before it adopts the IJ's reasoning as its own. See Lwin, 144 F.3d at 508-09 (explaining that we may find the BIA's summary affirmance of an IJ's flawed decision to be insufficient); see also Draganova v. INS, 82 F.3d 716, 720 (7th Cir. 1996).

The IJ's reasoning, minimal as it was, was rational and supported by the record. It is enough to show that a finding of persecution is not compelled here. The facts could reasonably be characterized as mere harassment, which is not the same as persecution. See Balazoski v. INS, 932 F.2d 638, 642 (7th Cir. 1991). True, the Jordanian police questioned Mousa and his family frequently from 1982 to 1987. The State Department, in an advisory opinion, determined that Mousa is listed in the Jordanian police database as a potential spy and threat. It found further that Mousa's name will probably not be deleted from this database for the rest of his life. But searches, interrogation, and even threatening phone calls do not constitute persecution unless they rise to extreme levels. See id.; see also Borca v. INS, 77 F.3d 210, 215 (7th Cir. 1996). It took him a year, but Mousa got a passport. He had a hard time finding a job in Jordan, but there is evidence in the record that the police certificate he accuses the police of withholding is not required to work in Jordan, and that Mousa's real problem was that potential employers were wary of him due to his past. The record may reasonably be read to infer that the harassment was not severe, and that the Jordanian police department's intrusion into Mousa's life will diminish with time, provided he refrains from participating in future violent actions like the Fatah attack.

This evidence could support a conclusion either to grant or to deny asylum to Mousa. Given that fact, it cannot be an abuse of discretion to choose one outcome over another, even if we would have come to a different conclusion. See, e.g.,

Marquez v. INS, 105 F.3d 374, 378 (7th Cir. 1997). In the final analysis, and in light of the generous standard of review that applies to our consideration of BIA asylum decisions, we therefore Affirm the decision of the Board.