**UNITED STATES of America**

v.

**Liudas KAIRYS, Defendant.**

**No. 80 C 4302.**

United States District Court, N.D. Illinois, E.D.

Dec. 28, 1984.

---

Norman Moscowitz, Michael Wolf, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Fred H. Bartlit, Jr., David E. Springer, Kirkland & Ellis, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

■ The government here seeks the denaturalization of Liudas Kairys, pursuant to 8 U.S.C. § 1451(a), on the grounds that he secured his immigration and citizenship by misrepresentation and concealment of material facts and because the facts concealed legally barred him from entering the United States at the time of his immigration. The central factual issue in this case is whether the defendant is the person the government contends he is. It is not disputed that in the determination of that factual issue all inferences in the evidence must be drawn as far as reasonably possible in favor of the citizen; and that with those inferences drawn favorably to the accused the government must prove each element of its case by clear, unequivocal and convincing evidence, with the government's proof not leaving the issue in doubt on any element of the case.

Defendant is not charged with war crimes. What is under attack is his status as a citizen. The basis for that attack is his alleged status some forty years ago, as a guard at the Treblinka labor camp. While the government contends that defendant was personally involved, on one or perhaps more occasions, in atrocities, its proof of that, as later more fully discussed, is insubstantial. What an individual guard by the name of Kairys may or may not have done at that camp is now lost in the mists of time.

It is perhaps helpful to begin by discussing the larger context in which this case arose. That context is historical, with much of it stipulated to by the parties.

In modern times Lithuania has existed as an independent national state only during the period between the World Wars. The district of Vilnius, the historical site of the Lithuanian capital, was originally under Lithuanian sovereignty when it became independent. However, in 1920, it was invaded by Poland and placed under Polish sovereignty. The period between the wars was marked by difficult relations between Poland and Lithuania, in large measure because of the Polish control of Vilnius. Germany, for reasons of its own, gave comfort to Lithuania during that period in its aspirations for a recovery of Vilnius.

In September 1939, following the German-Soviet nonaggression pact, Germany and the Soviet Union invaded and partitioned Poland. The Soviet Union thereafter occupied the eastern portions of Poland, including the Vilnius district. A month later, in October, it returned the City of Vilnius to Lithuanian sovereignty. In June 1940 the Soviet Union invaded and occupied the Baltic states and Lithuania ceased to exist as an independent nation. A year later, on June 22, 1941, Nazi Germany invaded the Soviet Union and Lithuania was rapidly overrun. During the remainder of the war the Germans employed Baltic nationals in paramilitary formations and in other capacities. Their status was not that of Germans but, although subordinate, it was considerably better than that of Poles, Russians, and Jews. The Balts occupied a rung on the Nazi "hierarchical principle of racism," which exploited "the antisemitic assertion of the existence of a 'worst' people in order properly to organize the 'best' and all the conquered and oppressed in between ... so that each people, with the necessary exception of the Jews, could look down upon one that was even worse off than itself." Arendt, *The Origins of Totalitarianism* (1951), p. 241.

In 1942 the Germans initiated "Aktion Reinhard," which was a plan for the systematic total extermination of all Jews in Europe. The German Schutzstaffel ("SS") was in large part responsible for carrying out this plan. One method for carrying out its plans, vis-a-vis Europe's Jews, was Nazi Germany's operation of numerous concentration camps, extermination camps and forced labor camps. The SS was responsible for the operation of these camps.

Although defendant did not so stipulate, it is beyond dispute that the SS recruited numerous Soviet prisoners who were to act as guards. Prisoners deemed politically reliable, such as various Baltic and Ukrainian prisoners, were inducted into guard units known as the SS Wachmannschaft. Many members of those units received training as camp guards at the Trawniki training camp in Poland. Some of the guard units served in the SS Commando Lublin in Po-

land. That unit had several functions over time, including guarding the Warsaw and Lublin Jewish ghettoes, guarding concentration camps and labor and extermination camps in and around Lublin, and participating in rounding up Jews in the Polish ghettoes and in their subsequent transportation. That guard service included service at the Treblinka labor camp.

The Treblinka labor camp was originally erected in late 1941 or early 1942 as a penal camp for Poles who committed various infractions of Nazi law. After the institution of Aktion Reinhard in 1942 the Germans erected the Treblinka extermination camp a few kilometers from the labor camp. Jews and others from Poland and elsewhere were thereafter sent to Treblinka (in addition to other similar camps) by the tens of thousands. Jewish prisoners sent to Treblinka were selected immediately for either death by gassing at the extermination camp or, if healthy, for forced labor in the labor camp or extermination camp. Approximately 900,000 Jews were murdered at the Treblinka extermination camp during the period of its existence.

The Treblinka labor camp was under the administration of German SS officers. Food rations for prisoners at the labor camp were inadequate and medical care for prisoners was virtually non-existent. Much of the labor performed by prisoners was exceedingly strenuous, including loading coal at a railroad station, breaking up and transporting stones from a quarry, chopping wood, paving and repairing roads, and loading sand from the banks of a nearby river. Prisoners at the labor camp were forced to work year-round, regardless of the weather. They worked six days a week from early morning until evening. As a result of these conditions the death of prisoners by disease or exhaustion was a weekly, and sometimes a daily, occurrence. Prisoners who became too weak to continue working were killed by members of the guard unit and the German SS. In addition to those deaths, prisoners of the Treblinka labor camp were shot, hanged, beaten or stabbed to death with and without apparent

reason by the German SS and the camp's guards. During the course of its operation several thousand Jewish prisoners died at the labor camp. As they died or were killed, they were replaced by new prisoners. The total number of prisoners generally varied between 500 and several thousand, including men, women and adolescents.

While the camp was not a death camp as such, unlike the nearby Treblinka extermination camp, it was anticipated that the prisoners at the Treblinka labor camp would, in due course, die from disease, malnutrition or overwork. As a matter of policy prisoners who could no longer work were—in the evening upon returning from work details—left between the fences on the perimeters of the camp for the purpose of being killed before the following day.

Besides the German SS officers, there were four platoons of non-German SS Wachmaenner, each platoon comprising between 10 and 25 guards. The guards were armed. Only Germans were generally authorized to enter the prisoner compound. The guards resided on the premises nearby and acted generally as perimeter and work detail guards.

The extermination camp was closed in the fall of 1943. In July 1944, as the Soviet army approached the vicinity of Treblinka, the labor camp was abandoned and burned. Over 300 Jewish prisoners were shot at that time, with only 10 to 15 survivors. Members of the guard unit participated in that massacre.

After evacuating Treblinka, the guards retreated westward into Germany. In February 1945 they were in Dresden, where they participated in the search for survivors, the burial of the dead and the clearing of the rubble following the firebombing of the city. From there, as the war came to a close, the unit moved into Czechoslovakia, where it was at the war's end.

The government contends the defendant was born Liudvikas Kairys on December 24, 1920, in the Village of Svilionys, Svencionys County, in eastern Lithuania. That area is in the Vilnius district, then under Polish sovereignty. His father's name was Petro and his mother's maiden name was Maria Meskelyte. Sometime prior to March 1940 defendant moved to Vilnius. In the spring of 1940 a Liudvikas Kairys, son of Petro, born December 24, 1920 in Svilionys Village, and residing in Vilnius, was granted Lithuanian citizenship. A Lyudvik Kayrov, son of Petr and Mariya, nee Meshkel, born December 24, 1920, had previously been baptized in the Village of Svilyany in 1921. The personal data underlying that application for citizenship specifies that Kairys completed a four-grade grammar school in the Village of Svilionys.

According to the government, defendant shortly thereafter entered service in the Lithuanian military. When the Soviet Union invaded and occupied all of Lithuania it absorbed the Lithuanian military into the Red Army. Defendant remained with his military unit and, within a few days after the invasion, he was captured. At some later time he was taken to the German prisoner-of-war camp in Hammerstein, Pomerania.

■ Defendant does not seriously dispute that a Liudvikas Kairys, son of Petro, born December 24, 1920 in Svilionys, lived on his parents' farm and thereafter moved to Vilnius where he was granted Lithuanian citizenship on May 4, 1940. The so-called Lithuanian documents, Government's Exhibits 40, 41, 42, 43, 44, 45 and 50, are all admissible as ancient documents, as self-authenticating and, for the most part, as public records. Indeed, no one has seriously questioned their authenticity and defendant testified that the newspaper announcement of the grant of citizenship, containing virtually all the information previously described, was an announcement in a Lithuanian publication. It is defendant's contention, however, that he is not the person referred to in those documents. Handwriting experts were unable to conclude that the signatures on certain of those documents were or were not in the handwriting of defendant.

That contention becomes important because of the evidentiary indications that the person in those documents was later a guard at the Treblinka labor camp. It is the whereabouts of the defendant during the period 1942–1944 that is the principal dispute. The government contends that defendant was recruited from the Hammerstein prisoner-of-war camp in 1942 by the Germans for service to them, that he was thereafter trained at Trawniki and, in July 1942, assigned to the SS Commando Lublin. In March 1943, according to the government, defendant was transferred to the Treblinka labor camp, where he served until the abandonment of camp, thereupon retreating westward with the guard unit. Toward the close of the war he participated with the guard unit in the burial details in Dresden and, again according to the government, was in Prague at the end of the war.

Defendant has consistently maintained that he was born December 20, 1924 in Kaunas. He agrees that his father's name was Petro and his mother's maiden name was Mariya Meskelyte and that he grew up on the family farm in Svilionys. He agrees that he moved to Vilnius and was living there in 1940, although he has testified that he resided there from 1938 on. He denies that he was naturalized in the spring of 1940, which would have been unnecessary if he had been born in Kaunas, which was at all times between the wars under Lithuanian sovereignty. He contends that the Liudvikas Kairys naturalized at that time is someone else, and he is unable to recall anyone of that name in the village, although he related that there were only 128 people there in 1939. His visa application recites that from 1938 to 1944 he was in Radviliskis and other places in Lithuania and from 1944 for a period thereafter was in Leitneritz in Czechslovakia.

In the job application to the company by which he was employed it is recited that he attended grammar school in Kaunas for six years and secondary schools in Radviliskis for four years, a total of ten years, the same period of education as listed on the visa application. In his deposition and trial defendant testified that he attended grammar school in Svilionys for four years, secondary school in Svencionys (near Svilionys) for four years and secondary school in Vilnius for three years. He testified that he was in Radviliskis and Vinuto, Lithuania, in 1941 and early 1942, in the Hammerstein POW camp for the remainder of 1942 and was, for the rest of the war, doing forced labor in Poland and Germany. He further testified that he did participate in the digging out of Dresden after the firebombing and that he was in Prague when the war ended. Finally, the defendant places a great emphasis on DX–1, an identity card purportedly issued in Radviliskis on August 7, 1941, indisputably bearing his signature and photograph. That card indicates that he resided in Radviliskis until May 1942 and then moved to Vinutas. It gives his eyes as blue and his hair as dark. It cites that he was born in Kaunas on December 20, 1924.

There seems little dispute that defendant lived and worked with a farmer near Regensburg for the period shortly after the war. He thereafter, from October 1946 until February 1947, lived and worked as a farm laborer in the Village of Wiesent. In 1947 defendant entered the United States Army labor service, a civilian auxiliary force made up of displaced persons which performed various services for the American occupation forces.

In April 1949 defendant initiated procedures to immigrate to the United States. A month later he immigrated to this country. In 1957 defendant applied for naturalization, which was granted later that year. Since coming to this country he has led an unremarkable life. He has worked in a blue collar job for the same company almost the entire period of his residence here, has married, has had two children, and has from time to time been involved in Lithuanian cultural affairs. He has testified that his given name has always been Liudas, rather than Liudvikas. Liudas is a diminutive of Liudvikas, and the Germanic version of both is Ludwig.

The government's proof is a combination of testimony and documentary evidence. Given the passage of time, the documentary evidence is far more significant than the witness identifications and GX–32 is by far the most significant document. That document purports to be the "personalbogen" (a German personnel record) for Ludwig Kairys, father's name Peter, birth date December 24, 1920, in "Luilionys". It recites his mother's maiden name as Maria Moshelyte and that he served in the Soviet Army through June 22, 1941. It states that his hair is dark blonde, his eyes are grey, and that there is a scar on his left hip. The document bears a photograph, a thumbprint and a signature. It indicates that he was on furlough from October 1 to October 14, 1942, that he was transferred from Trawniki to Lublin Commando on July 20, 1942, and that he was transferred to the Treblinka labor camp on March 22, 1943.

Recognizing the importance of the document, defendant has raised a substantial number of reasons why he contends that the document is not authentic, does not refer to him, and should not be admissible. He contends that there are sufficient suspicions raised regarding its authenticity so that it is not admissible as an ancient document, that for the same reason it is not self-authenticating, that it does not come within the public document exception because it is a foreign document and SS documents were not public and that there was insufficient foundation laid by a custodian. Finally, he argues that it cannot be introduced as an admission because it does not bear his signature and the statements in the document are not demonstrably his.

Defendant's attack on authenticity is itself varied. He introduced evidence that the photograph may possibly have been torn off or replaced, that there were indications of pencil marks and erasures, that it could not be conclusively established that it was his signature, that the chemical composition of the paper was such that its production in the immediate post-war period could not be eliminated, that the thumbprint ink was not normal and that the thumbprint could possibly have been placed

there by mechanical means. In so contending, he made in reality two arguments: that the document was a forgery or that it referred to a different person. That alternative argument created some logical inconsistencies, e.g., that the photograph was of someone else and had been placed on a forged document as part of a program of disinformation by the Soviet Union, or that the photograph was of a real Liudvikas Kairys who was born in Svilionys in 1920, but was not a photograph of defendant, who is a different person.

This court heard expert testimony on all aspects of that document. That evidence suggests that the photograph may at some point have been separated from the document through the failure of adhesive. There are pencil marks with typing over them to a considerable extent, and evidence of some erasures, none of which can be conclusively explained at this juncture, although the filling in of information by pencil, subsequently removed upon typing in the information, is a plausible explanation. The paper is old; it is conceivable that it dates from a subsequent time but the testing is consistent with paper in existence during 1942, and the quality of the paper, being poor, is not inconsistent with paper available during war time. One expert believes the signature is that of the defendant; defendant's expert finds enough dissimilarities to raise a doubt as to whether it is the signature of the defendant. Questions arise from the description of hair as dark blonde, of eyes as grey and of the location of a scar on the hip, although the photograph does depict a young man with, like defendant, a crooked nose and of a similar general facial structure. One expert, noting the lack of dissimilarities, believed that the photograph was more probably than not a photograph of defendant, but, given the passage of time, any such photographic identification remains uncertain.

■ Collectively, those questions might raise an issue as to whether GX–32 by itself proved unequivocally that defendant

was a person who served at Treblinka labor camp during the war. However, the document also contains a thumbprint which defendant does not deny is his and which the expert testimony demonstrates conclusively is that of Kairys. The evidence was undisputed that there is no known feasible way for the print to appear on that paper except by a natural person pressing his inked thumb to that paper. Further, no expert testified to the conclusion that the document was not authentic or that it was a forgery. The most that could be said is that certain aspects of the document were open to certain questions. When that evidence is combined with a recognition that the document was properly certified as coming from the Soviet archives—the repository of virtually all SS and related activities in Poland as the result of the overrunning of Poland by the Soviet armies in the latter days of the Second World War—and the fact that persons who were by their own admission guards at Treblinka labor camp verified their own "personalbogens" in substantially similar form, leads to the indisputable conclusion that the defendant was the person as identified in the "personalbogen."

In these circumstances, the court admits GX–32 as an ancient document and as an admission. *United States v. Koziy*, 728 F.2d 1314, 1321–1322 (11th Cir.1984).

With that, the other documentary evidence falls into place. Defendant concedes that a Kairys may have served at Treblinka. The other so-called Trawniki documents indicate that a Kairys, with some variations in spelling and first name, was a member of the Wachmannschaft in the Lublin District in 1942, that he was promoted to Oberwachmann on August 21, 1942, and that a Ludwig Kairys, born December 24, 1920 in Luilionys, ID No. 1628, was transferred to Treblinka in March 1943. I am persuaded that each of those documents is authentic. They alone, however, do not add much in view of the defendant's concession that there may well have been such a Kairys at Treblinka.

Defendant similarly attacks the testimony of various witnesses and the identification by some of the photograph in GX–32 as being that of the Kairys who served at Treblinka. Latakas, who had grown up with Liudvikas Kairys, testified in a deposition taken in Riga, Latvia, that he had talked with that Kairys at the end of 1943 or the beginning of 1944 during a leave in Svilionys about Kairys' service for the Germans (in the "personalbogen" Kairys' furlough is noted as October 1 through 14, 1942). He identified the photograph in GX–32 as that of the Kairys he knew. Zvezdun, whose deposition was also taken in Latvia, identified a Kairys as his platoon commander and had previously, in a statement to Soviet authorities given in 1980, identified a photograph of defendant as having similar features to those of the Kairys he knew. Amanaviczius, whose deposition was taken in Belgium, recalled a Kairys as his group commander at Treblinka, and identified his photograph in a picture photo-spread. Paul Fessler, also a guard, testified to a Ludwig Kairys being an Oberwachmann at Treblinka and as being tall and with a crooked nose. Zajanckauskas, who was at both Hammerstein and Trawniki, testified under immunity in Massachusetts. He also recalled there being a Kairys at both places, but could not identify the photograph. Kharkovskii and Vil'shun also testified at Riga that Kairys was at Treblinka but in the former case could not identify the photograph and in the other selected the wrong photo.

Defendant urges that the photo spreads were impermissibly suggestive, that the opportunities to cross examine in Riga respecting bias or improper motivation by the witnesses was unduly restricted and that the passage of time made any photographic identification exceedingly questionable. Finally, he points out that the two survivors who testified had never heard of Kairys while at the camp and could not identify the photograph.

This court concludes that the photo spreads were not impermissibly suggestive and that, given the totality of circumstanc-

es, they are entitled to be admitted and considered. At the same time, this court is well aware that people were being called upon to view the photograph of a person that they had not seen for forty years. Were this case to turn on the identification of the defendant by photographs taken forty years ago, there would be no doubt that the evidence that the photograph was of the defendant would not even remotely approach unequivocal and conclusive. The 1944 statement of Rekalo, the 1968 and 1971 statements of Swidersky, and the statements at the Swidersky trial by some of the witnesses in this case that a Ludwig Kairys or an L. Kairys or a Kairys was an Oberwachmann in Treblinka, all substantially undercut any notion that the presence of a Kairys at Treblinka was a recent fabrication by the witnesses as part of a Soviet disinformation campaign. The witness identification of a photograph as that of the Kairys who was at Treblinka does not, however, take us very much further. While there are no dissimilarities between the person depicted in the photograph and the defendant and each is someone who has had a broken nose, the expert testimony was that, given the passage of time, it can only be said that the photograph is more probably the defendant than not.

 Further, while the restrictions on cross examination in Riga were not nearly as severe as the defendant contends, they do indicate a more restricted latitude than would normally be permitted in courts here in attempting to determine what bias or motivation might possibly have influenced the witness in testifying as he did. Those matters go to weight, however, and this court is well satisfied that the testimony, together with the expert opinion, proves not that defendant is the person in the photograph but that that evidence is at the least wholly consistent with the contention that GX–32 is the "personalbogen" of defendant, as more strongly evidenced by the signature and as most strongly evidenced by the thumbprint. The court is persuaded beyond any reasonable doubt that the defendant is Liudvikas Kairys, born in Svilionys on December 24, 1920, who later became a resident of Vilnius, a Lithuanian citizen and ultimately an Oberwachmann at Treblinka labor camp.

The parties have argued at length the relative indicia of authenticity of defendant's identification card. If the government's evidence was not so conclusive, consideration of that argument would be of considerable significance. The evidence indicates that the identification document is not of recent origin and that it cannot be demonstrated either that such a document was not something which could have been issued in Lithuania in the early days of the war or that it was a document which was prepared shortly after the war.

Defendant dismisses the government's evidence that the forgery of identity documents was common among displaced persons attempting to immigrate. However, it is well known that such forgery was endemic. As *America and the Survivors of the Holocaust* (New York: Columbia University, 1982), by Leonard Dinnerstein, a recent study of the post-war immigration, states:

> As a result, document factories sprang up to provide whatever forms and authorizations a DP needed to produce. Many Balts and Ukrainians, for example, came to Germany with official government stamps and stationery. The American Army traveled with huge supplies of paper, ink, machines, etc., and black marketeers somehow found access to these materials. Sometimes, with or without these items, individuals used local craftsmen skilled in various types of forgeries. Some voluntary agency personnel also engaged in these illegal practices to speed the departure of DPs out of the assembly centers. Several thousand people had survived the war living by their wits, and the use of false papers did not strike them as improper. Most DPs regarded their own case as worthy, and if it simply meant changing a name, date, or place of birth or arrival to be accepted

in the United States, they saw no harm in doing so (pp. 195–196).[1]

Indeed, defendant testified that a birth certificate he had carried since 1938 was used by him for cigarette paper during the Dresden service, a highly implausible story and one which, as a variation of "I lost my papers in the firebombing at Dresden," was a story which was then used as an example by the authorities of explanations which should be looked upon with suspicion.[2]

That defendant was a guard at Treblinka and that he has consistently not told the truth about his place and date of birth or his whereabouts during the war does not, however, end the inquiry. We turn, again, to a consideration of what the government must establish.

This is not a "war crimes" case of the kind that occupied the time and attention of various tribunals shortly after World War II and thereafter. *See e.g.*, Cowels, "Trials of War Criminals (Non-Nuremberg)," 42 American Journal of International Law 299 (1948); Koessler, "American War Crimes Trials in Europe," 39 The Georgetown Law Journal 18 (1950). Nor did the government rely heavily upon defendant being guilty of moral turpitude because of wartime atrocities and therefore never eligible for American citizenship. While there is testimony of one fellow guard that he recalls seeing the Kairys he knew, from a considerable distance, participating in an atrocity, and defendant's presence and possible involvement in another incident and in the final massacre is unclear, the simple fact is that there is a lack of sufficient credible evidence of defendant's personal involvement in any specific atrocity.

None of the survivors recalls any specific conduct by Kairys, if they recall him at all.

Defendant argues that hyperamnesia, the indelible imprint of a prior traumatic experience, would cause survivors to recall Kairys if he was there. He virtually concedes, however, that some Kairys was a guard at the camp. The only reasonable conclusion is that defendant, never considered as a Barbie, an Artukovic, or a Trifa, provocateurs and organizers of wartime atrocities, was not a Swidersky either. Swidersky, another guard at Treblinka, was convicted of war crimes before a West German tribunal in 1968. The witnesses at that trial, including survivors, vividly recalled Swidersky's singular acts of brutality and sadism. Such testimony was absent here. We are left, then, with charges of illegal procurement, wilful misrepresentation or concealment and related moral turpitude charges, all arising from the 1949 entry into the United States and the subsequent naturalization in 1957. It also means that we are left with a case which does not differ in many respects from, for example, a charge that a citizen wilfully concealed his occupation as a bootlegger when he petitioned for citizenship. *See Costello v. United States*, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961).

Maintaining a separation between the charges of illegal procurement and wilful misrepresentation and concealment on the one hand and, on the other, the context in which they arose, is not easy. That context does, indeed, create the "hydraulic pressure" Justice Stevens referred to in his dissent in *Fedorenko v. United States*, 449 U.S. 490, 538, 101 S.Ct. 737, 763, 66 L.Ed.2d 686 (1981). That context obviously dictated the immense effort the government has devoted to this case. That context finds expression in the legal literature, *e.g.*, the

---

**1.** That is not to say that defendant acquired his identification document with immigration to the United States in mind. That document was in existence in 1947, when he was accepted for labor service, prior to passage of the Displaced Persons Act. He obviously felt he needed, after the war, identification other than that furnished by the Germans. It is more plausible to believe that the changes in first name, dates and places, stemmed from a fear that he might be repatriated to the Soviet Union, where it would be ascertained that he had served the Germans. Once defendant had somewhat changed his identity he was stuck with it.

**2.** There is a certain irony in defendant's relationship to the Holocaust, which has come to mean the Nazi genocidal campaign against the Jews, and his later involvement in another man-made holocaust, more in keeping with traditional definitions. And so it goes.

title of Breuer, "Denaturalization of Nazi War Criminals: Is There Sufficient Justice for Those Who Would Not Dispense Justice?", 40 Md.L.Rev. 39 (1981). That "hydraulic pressure" is, however, hardly surprising. For those who are old enough to recall the Allied armies storming across Poland and Germany, the movie newsreels and the newspaper and magazine photographs, progressively revealing the enormity of the horror of what had happened in central Europe during the war years, remain as graphically in memory as when first seen.

 Defendant argues that those events are too long ago—that the government's claims are barred by *laches* and that application of illegal procurement of citizenship provisions, even if statutorily mandated, would violate the *Ex Post Facto* clause of the United States Constitution. The short, and overly simplistic, answers are that the government cannot be barred by *laches* in a denaturalization proceeding,[3] *Costello v. United States, supra,* 365 U.S. at 281, 81 S.Ct. at 542, and that denaturalization is a civil, rather than criminal, proceeding, *Johannessen v. United States,* 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066 (1912); *United States v. Schellong,* 717 F.2d 329, 336 (7th Cir.1983), *cert. denied,*

— U.S. ——, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).

I say "overly simplistic," however, because *Johannessen's* analogy by a unanimous Court to land grants and patents came toward the close of the last great wave of virtually unrestricted immigration. A few years later, in the aftermath of the First World War, the plight of masses of rootless, stateless people in Europe drove home the nexus between citizenship and meaningful rights, *see* Arendt, *The Origins of Totalitarianism* (1951), pp. 265–298, and denationalization "became a powerful weapon of totalitarian politics...." *Id.* at 268.[4] The Supreme Court in *Schneiderman v. United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), did not abandon the concept of denaturalization as a civil proceeding and it invoked the land grant revocation analogy as justification for a higher burden of proof. It also, however, explicitly recognized the priceless status of citizenship (at p. 122, 63 S.Ct. at p. 1335):

> This is not a naturalization proceeding in which the Government is being asked to confer the privilege of citizenship upon an applicant. Instead the Government seeks to turn the clock back twelve years after full citizenship was conferred upon

---

3. It can also hardly be said that the government slept on its rights. The government was unaware that a Treblinka guard by the name of Liudas Kairys lived in the United States until the Soviet Union, stung by criticism of its lack of compliance with the Helsinki accords, provided that information from the archives created from captured German documents and other sources.

4. It is interesting to note the author's reference, at p. 276, to a French official's description of Vilnius as "*la capitale des apatrides*" because of its transfer back and forth among neighboring nation states in the aftermath of World War I. *Id.* at 276. That cycle resumed during World War II. Defendant, before he was 22, was a Polish national, a Lithuanian national, a Lithuanian soldier, a Soviet national, a Soviet soldier and a person of Baltic extraction recruited by the Germans for paramilitary duties. His statuses as a Soviet national and soldier were involuntary. We do not know the nature of defendant's recruitment by the Germans because he denies it. We do know that the mortality rate of Soviet prisoners in German P.O.W.

camps was appalling. Of over five million Soviet prisoners of war taken by the Germans, about three and one-half million died from massacre, starvation, and exposure. *See* I. Grey, *Stalin, Man of History,* 370 (1979); B. Dmytryshyn, *U.S.S.R., A Concise History,* 223–24 (1971). There was also some, perhaps self-serving, testimony of coercion in the recruitment at Hammerstein. One witness testified that a Hammerstein prisoner who refused to "volunteer" was shot. There is, apparently, no question that a person once recruited could not leave German service. It is also interesting to note that Soviet nationals who served at Treblinka and who thereafter were captured by the advancing Soviet armies were later imprisoned for a number of years and then released. In that respect they appear to have been treated much the same as Soviet P.O.W. survivors who went from German camps to Soviet camps, guilty only of being captured alive. *See* I. Grey, *Stalin, Man of History,* 371 (1979); R. Hingley, *Joseph Stalin: Man and Legend,* 371–72 (1974).

petitioner by a judicial decree, and to deprive him of the priceless benefits that derive from that status. In its consequences it is more serious than a taking of one's property, or the imposition of a fine or other penalty. For it is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance. By many it is regarded as the highest hope of civilized men. This does not mean that once granted to an alien, citizenship cannot be revoked or cancelled on legal grounds under appropriate proof. But such a right once conferred should not be taken away without the clearest sort of justification and proof.

In 1958 similar views were even more eloquently expressed by Chief Justice Warren in *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) at p. 101, 78 S.Ct. at p. 598:

> There may be involved no physical mistreatment, no primitive torture. There is instead the total destruction of the individual's status in organized society. It is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development. The punishment strips the citizen of his status in the national and international political community. His very existence is at the sufferance of the country in which he happens to find himself. While any one country may accord him some rights, and presumably as long as he remained in this country he would enjoy the limited rights of an alien, no country need do so because he is stateless.

*And see Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160–161, 83 S.Ct. 554, 563–564, 9 L.Ed.2d 644 (1963).

The year prior to defendant's entry into the United States, Congress had passed the Displaced Persons Act of 1948, Pub.L. No. 80–774, 62 Stat. 1009. That Act relaxed immigration quotas from 1948 to 1952 to permit the immigration of over 400,000 "displaced persons." A displaced person was defined as one "defined in Annex I of the Constitution of the International Refugee Organization and who is the concern of the International Refugee Organization." Annex I of the Constitution of the International Refugee Organization (I.R.O.) excluded from its "concern" those who had "assisted the enemy in persecuting civil populations of countries, Members of the United Nations" or "voluntarily assisted the enemy forces since the outbreak of the Second World War in their operations against the United Nations." The first exclusion generally applied to "war criminals," whose names were generally, but by no means always, listed by the United Nations War Crimes Commission. The emphasis in the second was upon "voluntarily," involving free will, and Balts who were conscripted were not to be classified as having voluntarily served. Enlistment was not automatically disqualifying; the applicant could seek to prove that the enlistment was coerced. In any event, the ultimate burden of proof was upon the applicant to demonstrate that he was the "concern" of the I.R.O.

The administrative procedures established to screen displaced persons applicants are described in *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981). The I.R.O. initially determined whether the applicant was their "concern." United States officials in the field thereafter determined whether the applicant was qualified under the Displaced Persons Act, which included within it most of the requirements of the then immigration statutes. It is beyond dispute that an armed guard at a camp such as the Treblinka labor camp was not eligible for a visa as a displaced person. The Supreme Court expressly so held in *Fedorenko v. United States, supra.*[5]

---

**5.** In *Fedorenko* the Court held that Congress intended the exclusion to extend to anyone who assisted, in any substantial manner, in the persecution of civil populations, whether or not that assistance was voluntary or coerced and that service as an armed concentration camp

The government contends that such a determination should end the matter: defendant was ineligible for a visa, he was therefore not lawfully admitted pursuant to a valid visa, and, accordingly, his subsequent naturalization was "illegally procured" and revocable pursuant to 8 U.S.C. § 1451(a). Before turning to that contention, however, we will discuss the other grounds advanced by the government for revocation. Those are that Kairys concealed material facts or made wilful misrepresentations on his visa application by concealing his wartime service and by using a false name, false birth date and false place of birth; that he did the same on his naturalization papers and further concealed his participation in atrocities and his falsehoods on his visa application; that he misrepresented his wartime occupation; and that he then lacked good moral character because of his participation in atrocities and his wilful misrepresentations.

The primary thrust by the government is concealment of wartime service because that service, if known, would have excluded Kairys as a matter of law. It is here that the government's case first falters. Plain-

tiff concedes that the representations of defendant to the I.R.O., whatever they might have been, could not now be a basis for revocation. It rests, initially, upon the visa application signed by Kairys which recites that during the period 1938–1944 he resided in Radviliskis and other places in Lithuania. If defendant resided where he served, that information is incomplete and, therefore, untrue. During that period he was physically present for extended periods in Trawniki and Treblinka camps, both in Poland. It is, moreover, unclear whether he ever resided in Radviliskas, and he certainly did not do so for the extended periods claimed. Even defendant concedes that.

■ The application does not, however, specifically inquire about wartime service. While Kairys undoubtedly had no interest in disclosing that service, the question is whether or not he clearly and unequivocally was asked to disclose it, and the answer is that he was not. It matters little that defendant may have perceived the inquiry as being directed to those places he considered "home," despite a temporary absence due to wartime service (a wholly

guard was such assistance. And certainly Congress could so restrict eligibility. The displaced persons programs of several countries, arising both from humanitarian reasons and the international ramifications of millions of people left by the Nazi war and the subsequent political realignments rootless and statelesses in a prostrate Europe, sought the resettlement of some but not all of those people. Among the equally deserving not all could emigrate. It is not surprising, therefore, that some would be preferred over others, and that people would be classified through a process involving a rather loose sieve. For example, Congress expressly excluded those who voluntarily served in German military formations, even though a German who voluntarily served in such units as the Waffen SS was eligible to be a quota immigrant unless he was implicated in war crimes. Because of the wholesale dispersion of populations and the destruction or unavailability of official records, the classification process was necessarily dependent to a large extent upon the unverifiable representations of applicants and whatever authentic appearing documents they produced (an incentive certainly for the forgery of documents described, Dinnerstein, *supra*).

As is apparent from the I.R.O. Manual for Eligibility Officers, field personnel made prag-

matic credibility judgments, with adherence to a particular group or participation in a particular unit being judged in light of information about that group or unit's recruitment, activities and apparent adherence to Nazi doctrines. It is not at all clear that, to the I.R.O., a camp guard was conclusively not its "concern" if he could show he was conscripted and did not participate in any atrocities, and it is the I.R.O. definition Congress adopted. Contrary to the testimony in *Fedorenko*, there is as well a considerable question whether guard service was voluntary, since there is some question whether or not the original recruitment was voluntary. It does not appear that the nature of the services to be performed were defined, and the assignment to guard service was by military order. Further, a government witness in this case indicated that the exclusion was not necessarily automatic. Even if *Fedorenko* had not concluded the matter, however, those uncertainties would not have helped defendant. It is clear that defendant here would not have been a "concern" and, therefore, eligible for a visa if his wartime service had been disclosed and he had thereafter been unable to demonstrate that his service was coerced and that he did not participate in atrocities. That demonstration he has not been prepared to make, since he has denied the service.

unlikely perception by defendant although not at all unlikely for, say, a former United States serviceman who was drafted from "home" and thereafter served in a number of places in the United States and overseas), or that he believed he could so interpret the inquiry. The simple fact is that he was not specifically directed to disclose. It was not until 1950, after defendant had entered the country, that sec. 13 of the DPA was amended to require an explicit oath denying the kind of service in which defendant was engaged. Pub.L. No. 555, 64 Stat. 227.

Defendant goes further. He seeks to avoid responsibility for the visa application he signed, on the ground that it has not been conclusively determined that he fully understood the information sought. The procedures, however, provided for a careful translation of the form before it was filled in and executed, and Kairys had to know that preparation of the visa application was of significance. The presumption of official regularity, see United States v. Chemical Foundation, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926); Borg-Warner Corp. v. Commissioner, 660 F.2d 324, 330 (7th Cir.1981), defeats that argument, but it does not save the government's additional contention: that defendant was undoubtedly asked about his wartime service because that was a routine inquiry. The evidence was not so conclusive. There was no introduction of any written policy to that effect. At most the testimony indicated that it was a common inquiry, although in the mass processing then going on it is also quite likely that the inquiries were perfunctory and confined to the application.

The application to file a petition for naturalization is even more ambiguous. When asked what organizations, clubs or societies in the United States "or in any other country" of which he had been a member both during the last ten years and before the last ten years, defendant responded "none." The government contends that he should have listed his wartime service. That contention was persuasive in United States v. Schellong, 717 F.2d 329 (7th Cir.1983), cert. denied, —— U.S. ——, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984), but there the defendant clearly understood the inquiries to include military and paramilitary service, as he listed some service but omitted other service and specifically disclaimed service in a concentration camp, "by far the most damning." Id. at 334. Here, by the government's argument, any service in the United States military should have been listed in the responses to questions 8 and 9, even though that specific inquiry was made in question 16, where Kairys did list his labor service. Again, a later application form, and the form now in use, specifically asks about service in military and paramilitary units during the war and in labor camps, but that was not the form used when Kairys applied for citizenship.

The government seeks to rely, also, upon the change in spelling of the first name, the false birth date, the false place of birth and false residences. This court is wholly persuaded that the false information was wilfully represented by defendant. It is, however, not material as that term has come to be defined. The Supreme Court in Fedorenko v. United States, supra, expressly declined to determine whether the standards previously enunciated in Chaunt v. United States, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960), applied to DPA visa applications, but the lower courts have consistently assumed or held that they do. The meaning of those standards remains unclear; the circuits are divided, see United States v. Kowalchuk, 744 F.2d 301 (3d Cir.1984), rehearing en banc granted, opinion withdrawn from publication, and the Seventh Circuit has yet to rule.[6] Even read broad-

6. One does wonder how denaturalization based upon the possibility that the disclosure of nondisqualifying facts years earlier could conceivably have led to the discovery of disqualifying facts squares with the Supreme Court's express recognition in Schneiderman v. United States, supra, that denaturalization, in which the government "seeks to turn the clock back," is

ly, however, the *Chaunt* second prong requires a possibility that the disclosure of the true facts would have led to the discovery of disqualifying facts. Here the nexus between a Kairys born December 24, 1924 in Svilionys and a Kairys at Treblinka was, both in 1949 and 1957, unknown, and given that the information respecting such a nexus was solely in Soviet archives probably unknowable. Kairys could have, with impunity, listed his proper first name, place of birth and birth date, and a Svilionys residence, and the visa and certificate of naturalization . would have issued. *See United States v. Rossi*, 299 F.2d 650 (9th Cir.1962). Nor does defendant's listing of "farmer" add much to the government's case. He was raised on a farm, he worked on a farm immediately after the war, and he claims that he studied farming when he was associated with the U.S. Army. In any event, it was probably as close to a civilian occupation as Kairys had ever had when he so claimed it as his own.

The case, then, comes down to whether defendant's certificate of naturalization is revocable because it was "illegally procured." That raises two issues: (1) is naturalization illegally procured if it is based upon admission to this country upon a visa for which the petitioner was ineligible, and (2) is "illegally procured" a ground for revocation now even though it was not a ground in the statute at the time of defendant's naturalization. We deal with the second issue first.

Defendant contends that illegal procurement cannot serve as a basis for revocation because it was not included in the statute at the time of defendant's naturalization and a congressional intention of retrospective application has not been clearly manifested. In 1957, when Kairys was naturalized, 8 U.S.C. § 1451(a) did not list illegal procurement as a basis for revocation. In 1961 Congress, noting that the Fifth Circuit in *United States v. Stromberg*, 227 F.2d 903 (5th Cir.1955), did not find illegal procurement preserved from the 1940 Act as a basis for revocation, added that lan-

guage to the statute. *See* H.R.Rep. 1086, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code, Cong. & Ad.News 2950, 2982. Defendant concedes that retroseptive application of an amendment is generally without legal infirmity if Congress so intended, *see generally, Union Pacific R.R. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913); *South East Chicago Commission v. Dept. of Housing & Urban Development*, 488 F.2d 1119, 1122 (7th Cir.1973), but argues that no such intent was manifested here.

█ Retrospective application of an amendment is generally not implied. No such application, however, is sought here. Sec. 1451 is a denaturalization statute, regulating denaturalization proceedings. It is a remedial provision. This denaturalization action was brought in 1980, well after enactment of the amendment. The granting of citizenship—the substantive right sought to be protected by defendant—is governed by other sections, including 8 U.S.C. § 1181, which were in effect in 1957. Sec. 1181 requires a valid immigrant visa for legal admission to this country, a requirement defendant did not fulfill.

█ Sec. 1451(i) evidences clear congressional intent that this action be governed by sec. 1451(a) as it currently exists. Sec. 1451(i), promulgated in 1952, states that the provisions of sec. 1451 apply to all certificates of naturalization, whenever granted, without regard to what revocation standards were in effect at the time of naturalization. The 1961 amendment, then, was of a section which already provided for retrospective application. It must be assumed that Congress was aware of sec. 1451(i) when it enacted the 1961 amendment and was aware of the clear statutory language to that effect.

Indeed, it is difficult to conceive why Congress, in view of the purpose of the amendment, would have it apply to citizenships illegally procured after enactment but not before. A similar intent has been followed by the Supreme Court in constru-

significantly different from the original natural- ization.

ing predecessor statutes. *See e.g., Luria v. United States,* 231 U.S. 9, at 24, 34 S.Ct. 10, 13, 58 L.Ed. 101 (1913); *Johannessen v. United States,* 225 U.S. at 240–43, 32 S.Ct. at 616–17. An act which is amended "should be construed as to future events as if it had originally been enacted in that form." 1A, C. Sands, *Sutherland on Statutory Construction,* § 22.35 at 197 (4th ed. 1972) (treatise cited approvingly by both parties). Sec. 1451, if enacted in its present form in 1961, would allow application of the illegal procurement standard to this action. The illegal procurement standard does properly apply to defendant's denaturalization proceeding. *See generally United States v. Koziy, supra* (applying illegal procurement standard in denaturalization proceeding where citizenship was acquired in 1956).

Revocation premised upon illegal procurement was, from time to time, granted without regard to any mental state of the defendant. *See United States v. Ginsberg,* 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853 (1917); *United States v. Ness,* 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed. 321 (1917); *United States v. Beda,* 118 F.2d 458 (2d Cir.1941). The obvious inequities of a mechanical application of such an interpretation led courts to ameliorate or ignore it in numerous cases, *e.g., United States v. Anastasio,* 226 F.2d 912 (3d Cir.1955); *United States v. Bialoglowski,* 21 F.Supp. 613 (S.D.Calif. 1937), *aff'd* 101 F.2d 928 (9th Cir.1939). The result was that, in 1952, when "illegally procured" was removed from the statute as a basis for revocation and in 1961, when it was returned to the statute, the case authority was in hopeless confusion, as is well documented in *United States v. Kusche,* 56 F.Supp. 201 (S.D.Calif.1944).

The legislative history of the 1961 amendment, however, crystallizes Congress' intent in returning the words "illegal procurement" to the statute. The sponsors of the amendment intended to combat fraud in naturalization proceedings. *See* 107 Cong.Rec. 18,284 (1961) (remarks of Rep. Walter); 107 Cong.Rec. 19,651 (1961) (remarks of Sen. Eastland). They were concerned with the same proof problems that have arisen here. *See* H.R.Rep. 1086, 87th Cong., 3d Sess., 39, *reprinted in* 1961 U.S.Code, Cong. & Ad.News, 2950, 2983. The House report, in advocating the adding of the amendment, made it clear what it intended the addition to accomplish. "The congressional mandate that no person shall be naturalized unless possessed of certain qualifications is ineffectual unless there is also statutory provision for revoking citizenship where the prerequisites did not in fact exist. In the majority of such cases it is difficult if not impossible to prove there was concealment of material facts or wilful misrepresentation." *Id.* To that end, Congress added the "illegal procurement" basis for revocation to remove the intent requirement and to allow denaturalization for any failure of a condition precedent to the naturalization.

Naturalization is illegally procured if some statutory requirement is absent at the time the petition was granted. In other words, naturalization has been illegally procured if jurisdictional factors are not present at the time citizenship is granted. (*United States v. Ginsberg,* 37 Sup.Ct. 422, 243 U.S. 472, 61 L.ed. 853.) *Id. See United States v. Koziy,* 728 F.2d 1314, 1318 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984).[7]

---

**7.** This is apparently the definition adopted by the Court in *Fedorenko.* The Court cited with approval the strict illegal procurement definition of *United States v. Ginsberg* and *United States v. Ness. Fedorenko v. United States,* 449 U.S. at 506–07, 101 S.Ct. at 747–48. *See also id.* at 515, 101 S.Ct. at 751. In *Fedorenko,* a material misrepresentaion was found and, though analyzed through the illegal procurement language, this misrepresentation constituted fraudulent procurement, which has not been sufficiently proven here. Justice Stevens, in his dissent in *Fedorenko,* however, characterized the Court's decision in a manner totally consistent with the amendment's legislative history. "Because the Court holds as a matter of law that petitioner's service as a guard at Treblinka, whether or not voluntary, made him ineligible for a visa, petitioner was not legally admitted to the country and hence was not entitled to citizenship." *Id.* at 533, 101 S.Ct. at 761.

. That doctrine was sanctioned by *United States v. Ginsberg, supra,* and it has been given renewed vigor by *Fedorenko.* The absence of defined constitutional restrictions, other than an enhanced burden of proof, leaves citizenship by naturalization vulnerable to revocation many years later, regardless of culpability. For example, a physical examination years later may determine that an immigrant had, unknown to him, tuberculosis when he entered this country and therefore was ineligible for a visa. Continued citizenship may, in those circumstances, depend solely upon an executive decision not to seek revocation. That doctrine, coupled with the inapplicability of *laches,* leaves the naturalized citizen always at risk. Small wonder it is, then, that courts have struggled against the rigors of its application.

■ This court is troubled by the implications of a power, largely unchecked by constitutional restraints, to revoke citizenship based upon some decades-old error, however clearly demonstrated. "Citizenship *is* man's basic right for it is nothing less than the right to have rights." *Perez v. Brownell,* 356 U.S. 44, 64, 78 S.Ct. 568, 579, 2 L.Ed.2d 603 (1958) (Warren, C.J., dissenting). Revocation becomes dependent upon highly selective executive discretion, which in turn is influenced by subsequently arising policy priorities—involvement in organized crime, pan-Germanism during World War II, Communist affiliation or, as here, a response to belated disclosures and criticisms by the Soviet Union.

The implications of virtually unrestrained congressional and executive power over the continuing status of citizenship has led to a number of decisions by a sharply divided Court respecting denationalization by expatriation. During the post-war period many lower courts adopted an elastic concept of duress to ameliorate the rigors of expatriation provisions. *See e.g., Stipa v. Dulles,* 233 F.2d 551 (3d Cir.1956); *Soccodato v. Dulles,* 226 F.2d 243 (D.C.Cir.1955); *Mendelsohn v. Dulles,* 207 F.2d 37 (D.C.Cir. 1953); *Takehara v. Dulles,* 205 F.2d 560 (9th Cir.1953). Expatriation law was, at

that time, as confused as denaturalization for illegal procurement (see p. 1269, *supra*). The Supreme Court thereafter recognized congressional authority to provide for expatriating acts even in the absence of a specific intent to surrender citizenship, if there were foreign relations implications, *Perez v. Brownell,* 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958). That authority did not, however, extend to expatriation as a penal sanction, *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), and the Court adopted both a stringent burden of proof and an expansive scope of review, *Nishikawa v. Dulles,* 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958). That expatriation could not be employed as a penal sanction was again determined in *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).

Four years later the Supreme Court, in *Afroyim v. Rusk,* 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967), overruled *Perez v. Brownell, supra.* In a 5–4 decision it held that expatriation required not only voluntary conduct but also an informed and voluntary renunciation of citizenship. The Court adhered to that view in *Vance v. Terrazas,* 444 U.S. 252, 100 S.Ct. 540, 62 L.Ed.2d 461 (1980), but it also concluded that Congress could adopt proof standards less stringent than those imposed in *Schneiderman v. United States, supra,* and *Nishikawa v. Dulles, supra,* specifically holding that those decisions were not rooted in the Constitution.

In *Afroyim v. Rusk, supra,* the Court noted a distinction between expatriation and denaturalization. *Id.* 387 U.S. at p. 267, fn. 23, 87 S.Ct. at p. 1667, fn. 23. ("Of course, ... naturalization unlawfully procured can be set aside.") The Court introduced a further qualification in *Rogers v. Bellei,* 401 U.S. 815, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971), where it recognized a distinction between Fourteenth Amendment citizenship, whether by birth or naturalization, and citizenship acquired solely by statutory enactment (there, birth abroad to a couple of whom one was a United States citizen and one was an alien). The Court relied, in part, at p. 830, 91 S.Ct. at p. 1068, upon *United States v. Ginsberg, su-*

*pra,* and *United States v. Ness, supra,* just as it later did in *Fedorenko v. United States, supra.*

The doctrine of illegal procurement, particularly in light of the holding in *Vance v. Terrazas, supra,* that a stringent burden of proof in denaturalization cases is subject to statutory change, imparts an extraordinary fragility to citizenship acquired by naturalization. It is difficult for this court to rationalize the present law of denaturalization with *Schneider v. Rusk,* 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964), where the Court started "from the premise that the rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive," absent material fraud in procurement and with the concept in *Afroyim v. Rusk, supra,* that loss of citizenship by expatriation requires a voluntary and informed choice. *Id.* 377 U.S. at pp. 165–166, 84 S.Ct. at pp. 1188–1189. The Supreme Court has, however, accorded illegal procurement a continuing vitality, and this court is bound to follow.[8]

Pursuant to that doctrine, Kairys is properly subject to denaturalization. As stated previously, an armed guard at the Treblinka labor camp was not eligible for a visa under the Displaced Persons Act. *See Fedorenko v. United States, supra.* This is so with or without a material misrepresentation. Kairys, therefore, was not statutorily eligible for the visa he procured pursuant to the Act. Because he did not fulfill all of the statutory requirements for his naturalization, his citizenship was illegally procured. *See United States v. Koziy,* 728 F.2d at 1318–19; *United States v. Kowalchuk,* 571 F.Supp. 72 (E.D.Pa.1983), *rev'd on other grounds* 744 F.2d 301 (3d Cir.1984), *en banc hearing granted; United States v. Dercacz,* 530 F.Supp. 1348, 1351–52 (E.D.N.Y.1982). Accordingly, defendant's certificate of naturalization must be revoked.

8. The expatriation cases mandate a voluntary renunciation, an intentional relinquishment. Citizenship by naturalization is accorded in the Fourteenth Amendment a status equal to citizenship by birth in this country. Once citizenship has attached through official naturalization proceedings, with all the expectations that inevitably and justifiably flow from those proceedings, one wonders how that citizenship can be revoked in the absence of some intentional conduct chargeable to the citizen which taints that proceeding, customarily fraudulent concealment of material facts. That has not, however, been the direction of the Supreme Court cases respecting denaturalization and, accordingly, it is not a direction this court can pursue.